# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**NORTH ATLANTIC**                                      **CIVIL ACTION NO.**
**SECURITY COMPANY**
                                                        **19-379-EWD (CONSENT)**
**VERSUS**

**FABIAN BLACHE, ET AL.**

## RULING AND ORDER ON MOTION TO DISMISS

Before the Court is a Motion To Dismiss the Revised Complaint (the "Motion"),[1] filed by

Defendant Fabian Blache ("Blache").  The Motion is opposed by Plaintiff North Atlantic Security

Company ("North Atlantic"),[2] and Blache has filed a reply memorandum.[3]  As North Atlantic has

alleged sufficient information to survive dismissal, and questions of fact preclude resolution of the

claims at this time, the Motion is denied.[4]

## I.   Background

On or about March 29, 2019, North Atlantic filed a "Petition for Damages under 42 USC

1983" (the "Petition") naming Ritchie Rivers ("Rivers") and Blache as defendants in their

individual capacities.[5]  The Petition alleges that Blache, the executive director of the Louisiana

Board of Private Security Examiners (the "Board"), and Rivers, a member of the Board,

improperly fined North Atlantic and revoked North Atlantic's license to operate as a private

security company in Louisiana in violation of the Eighth and Fourteenth Amendments to the

---

[1] R. Doc. 27.

[2] R. Doc. 32.

[3] R. Doc. 36.

[4] On August 26, 2019, the parties filed a Joint Consent to Jurisdiction by Magistrate Judge.  R. Doc. 16.  Thereafter, an Order of Reference was entered in this case referring this matter to the undersigned "for the conduct of all further proceedings and the entry of judgment in accordance with 28 USC 636(c)…."  R. Doc. 23.

[5] *See* R. Doc. 1-2, which is incomplete, and therefore, some citations are to North Atlantic's Revised Complaint at R. Doc. 25.

United States Constitution.[6]  The facts of the Petition, which are accepted as true for purposes of the Motion, are as follows:

> The revocation arose as the result of a tip from Rivers, who also operates a security company, to Blache that the firearms certification of security guard Joshua Lands ("Lands") had lapsed on August 11, 2018. Lands worked for North Atlantic at an armed post, and for Rivers at an unarmed post.[7]  Rivers or someone employed by Rivers told Lands not to worry about attending firearms refresher training.[8]  Rivers and Blache orchestrated this "power play" using Lands as an "unwitting pawn" in order to effect the revocation of North Atlantic's license because North Atlantic, a Mississippi company, had secured "lucrative contracts in Louisiana" which Rivers and Blache believed should have gone to Louisiana companies.[9]  Acting on the tip, Blache conducted an unannounced inspection of Lands at his North Atlantic post on August 14, 2018, and learned that the Lands' firearm certification had lapsed three days earlier and Lands did not have the proper paperwork.[10]  Later that day, Blache issued a cease and desist order to North Atlantic; advised North Atlantic that its license was being revoked for having a guard with an unauthorized weapon, which was grounds for immediate action; fined North Atlantic $9,500; and notified all of North Atlantic's clients that its license had been revoked.[11] However, at the request of the State of Louisiana, the revocation was made effective on August 31,

---

[6] *See* R. Doc. 1-2, ¶¶ 12, 19, 21.
[7] R. Doc. 25, ¶¶ 3, 7-10.
[8] *Id.* at ¶¶ 4, 7.
[9] R. Doc. 25, ¶¶ 4-7.
[10] R. Doc. 25, ¶ 10.
[11] R. Doc. 25, ¶ 11-12.  North Atlantic avers that Lands obtained the required training by August 15, 2018.  R. Doc. 25, ¶ 16.

2018 so that the State could get other companies to handle North Atlantic's contracts.[12]

As a result of Rivers' and Blache's actions, all of North Atlantic's clients "began scrambling to get other security companies to take over" North Atlantic's contracts, some of which companies also sat on the Board and thus had conflicts of interest.[13]

By the end of August 2018, North Atlantic "had been destroyed as a viable company in Louisiana" and "lost millions of dollars."[14] Blache's actions in immediately revoking North Atlantic's license without a board vote or a hearing was in violation of La. R.S. 37:3289 and North Atlantic's Fourteenth Amendment due process rights.[15] North Atlantic's damages "exceed $2 million" and include "loss of income, past, present and future;" "[v]iolation of Constitutional rights of due process before deprivation of property under the Fourteenth Amendment to the Constitution;" "[e]xcessive fines, in violation of the Excessive fines clause of the Eighth Amendment…;" as well as punitive damages and attorney fees.[16]

On June 11, 2019, Rivers filed a Notice of Removal asserting this Court has federal subject matter jurisdiction pursuant to both 28 U.S.C. § 1331[17] and § 1332.[18] On August 20, 2019, North Atlantic filed a Motion for Leave to File First Amended Complaint,[19] which was granted in part,[20]

---

[12] R. Doc. 25, ¶ 15.
[13] R. Doc. 25, ¶¶ 13, 14.
[14] R. Doc. 1-2, ¶ 17. *See also id.* at R. Doc. 20.
[15] R. Doc. 25, ¶ 19.
[16] R. Doc. 1-2, ¶¶ 21-24.
[17] R. Doc. 1, ¶ 4 ("This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based upon the allegations made by plaintiff in its petition which arise under federal law, more specifically claims for a violation of 42 U.S.C. § 1983 and § 1988, et seq.").
[18] North Atlantic is alleged to be "a Mississippi company organized under the laws of the state of Mississippi." R. Doc. 1, ¶ 10. Rivers and Blache are alleged to be domiciliaries of Louisiana. R. Doc. 1, ¶ 11. North Atlantic's Petition alleges damages that exceed $2,000,000.00. R. Doc. 1-2, ¶ 24.
[19] R. Doc. 10.
[20] R. Doc. 24.

permitting North Atlantic to add a due process claim under Article I, Section 2 of the Louisiana Constitution.[21] North Atlantic was also permitted to assert that Blache's testimony at the hearing in support of immediate revocation, *i.e.* that Lands' weapon was "unauthorized," was a "tortured application of the law" because Lands' .38 caliber handgun was an authorized weapon according to the Board's regulations.[22] Thereafter, both Rivers and Blache filed Motions to Dismiss.[23] North Atlantic dismissed its claims against Rivers with prejudice.[24]

## II.  Legal Standard on Fed. R. Civ. P. 12(b)(6) Challenge

In *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*,[25] the United States Supreme Court addressed the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[26] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[27] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[28] It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"[29] "Where a Complaint pleads facts that are 'merely consistent with' a

---

[21] R. Doc. 25, ¶ 26.
[22] R. Doc. 25, ¶ 27.
[23] R. Docs. 26, 27.
[24] R. Doc. 37 and R. Docs. 40-41 (granting North Atlantic's Motion to Dismiss Rivers and denying Rivers' Motion to Dismiss as moot).
[25] *Twombly*, 550 U.S. 544 (2007) and *Iqbal*, 556 U.S. 662 (2009).
[26] *Twombly,* 550 U.S. at 555.
[27] *Iqbal,* 556 U.S. at 678, *quoting Twombly,* 550 U.S. at 570.
[28] *Iqbal,* 556 U.S. at 678
[29] *Id.* at 679.

defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[30]

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court "must accept as true all of the factual allegations contained in the Complaint."[31]  While factual assertions are presumed to be true, "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" alone are not enough to withstand a Fed. R. Civ. P.12(b)(6) motion.[32]

## III.   Analysis

### A.   Louisiana Laws, Regulations, and Administrative Procedures Regarding Private Security Businesses and Governance by the Board

Three sets of laws and administrative provisions are applicable to private security businesses in Louisiana; namely: (1) Louisiana's Private Security Regulatory and Licensing Law, at La. R.S. 37:3270 *et seq*.; (2) the Board's regulations set forth in Title 46, Part LIX of the Louisiana Administrative Code ("La. Admin. Code") and (3) Louisiana's Administrative Procedures Act ("APA"), La. R.S. 49:950, *et seq*.[33]

*Powers and Duties of the Board*

La. R.S. 37:3273 creates the Board as an agency of the State of Louisiana within the Department of Public Safety and Corrections, which is authorized to adopt rules and regulations governing the practice of private security, and is also authorized to suspend, modify or revoke license or registration cards to provide private security.[34]  The Board is authorized to investigate

---

[30] *Id.* at 678 (internal quotation marks omitted).
[31] *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).
[32] *Iqbal*, 556 U.S. at 678.
[33] *See* La. R.S. 37:3274(A)(10) and La. R.S. 37:3296 (The Board is required to govern in accordance with, and adopt rules and regulations in accordance with, Louisiana's Administrative Procedures Act, La. R.S. 49:950, *et seq*.).
[34] La. R.S. 37:3274(A)(3), (4).  *See also* La. R.S. 37:3274(B)(1), which authorizes the Board to adopt and enforce rules and regulations, bylaws, and rules of professional conduct it deems necessary to regulate private security businesses in the State.

alleged violations of the law, rules, and regulations related to private contract security companies.[35]

Likewise, according to the regulations, the Board "may investigate the actions of any licensee. The investigation shall be conducted for the purpose of determining whether a licensee is in compliance with R.S. 37:3270-3298" and the Board's regulations.[36]  Such investigations "are of alleged violations by a licensee or registrant as a result of a complaint" and prior written and verbal notification of the investigation is not required.[37]

*Private Security Businesses and Security Officers*

Security officers must apply to the Board for a registration card.  They must carry the card when performing the duties for which they are registered and must show the card to authorized Board representatives upon request.  The registration card entitles the officer to perform the duties described in the law as long as the officer maintains his legal eligibility.[38]  Among other registration requirements, and pertinent to the instant Motion, security officers are required to complete firearms training and range qualifications prior to their initial armed assignment, as well as an annual firearms retraining course.[39]

*Cease and Desist Orders*

In addition to, or in lieu of, the criminal penalties and administrative sanctions otherwise provided (*see below*), the Board "is empowered to issue an order to any person or firm engaged in

---

[35] La. R.S. 37:3274(A)(9).

[36] La. Admin. Code tit. 46, Pt LIX, §805(A) (emphasis added).

[37] La. Admin. Code tit. 46, Pt LIX, §805(B).

[38] La. R.S. 37:3283(A)(1) and (B) *and see* La. Admin. Code tit. 46, Pt LIX, §813 (No person can provide contract security services except in accordance with requirements for licensure and the Board's regulations) and La. Admin. Code tit. 46, Pt LIX, §301(K)(1) (Registration cards are issued after a Board investigation determines that the applicant meets the requirements to become registered and the Board receives verification that the applicant has successfully completed required training.)

[39] La. R.S. 37:3284(B)(2) and (D).  *See* La. Admin. Code tit. 46, Pt LIX, §405(D) ("Annual refresher firearms training…is due one year from the date of the last firearms training record at the board office….") Further, "authorized weapons" include a .38 caliber revolver, minimum 4-inch barrel, such as the one carried by Lands.  La. Admin. Code tit. 46, Pt LIX, §405(E)(2); R. Doc. 25, ¶¶ 16, 18.

any activity, conduct, or practice constituting a violation…, directing such person or firm to forthwith cease and desist from such activity, conduct, or practice. Such order shall be issued in the name of the state of Louisiana, under the official seal of the board."[40]  The regulations provide for the appointment of an executive secretary to serve as the Chief Administrative Officer of the Board, *e.g.*, Blache, who has the authority to "sign off on" cease and desist orders.[41]

*Administrative Penalties*

La. R.S. 37:3288, "Administrative Penalties," provides, in pertinent part:

> A. (1) Any person who is determined by the board, after reasonable notice and opportunity for a fair and impartial hearing held in accordance with the Administrative Procedure Act, to have committed an egregious act that is a violation of this Chapter or regulation or rule issued thereunder is subject to an administrative penalty of not more than five thousand dollars per violation per day and shall subject such person to revocation of his license. Such egregious acts shall include but not be limited to the following:
> …
>  (e) Operating a private security business without obtaining the required firearms training.
>
> (2) Any person committing any non-egregious acts in violation of this Chapter or any regulation or rule issued thereunder is subject to an administrative penalty of not more than one thousand dollars per violation per day. [42]

Further, 46 La. Admin. Code, tit. 46, Pt LIX, § 901(A),  "Administrative Penalties Pursuant to R.S. 37:3288," provides:

> Any person who is determined by the board, after reasonable notice and opportunity for a fair and impartial hearing held in accordance with the Administrative Procedure Act, to have committed an act that is a violation of R.S. 37:3270 *et seq.* [the Private Security Regulatory and Licensing Law], or any rule herein, is subject to an administrative penalty of not more than $500 per violation; and/or denial, suspension, or revocation of a license or registration card;

---

[40] R.S. La. 37:3293(A).
[41] La. Admin. Code tit. 46, Pt LIX, § 103(H)(8)-(10).
[42] *See also* La. R.S. 37:3274(A)(11), which authorizes the Board to adopt rules to authorize the assessment of administrative penalties in the form of fines not to exceed five hundred dollars per violation and the cost of the Board's proceedings.

and/or imposition of probationary conditions or other restrictions including assessment of administrative costs incurred.

*Minor Violations*

Next, La. R.S. 37:3288(B) provides that the Board, in accordance with the APA, may adopt a schedule of administrative penalties for minor violations that can be assessed by the executive secretary when the violator waives the right to an administrative hearing.[43]  The associated regulation, La. Admin Code. tit. 46, Pt. LIX § 903, "Administrative Penalties Pursuant to La. R.S. § 37:3288(B)," provides for penalties that may be assessed in lieu of, but not limited to, bringing the licensee before the board at a hearing, which includes a penalty of $50 to $100 against a licensee who allows a registrant to carry an unauthorized weapon while on duty.[44]

*License Revocations*

La. R.S. 37:3289 provides that the Board may revoke any issued license "for good cause shown," based on a number of reasons, including "violation of any provision of this Chapter or any rules or regulations of the board…."[45]  Notably, "four concurring votes of the board shall be required for the revocation of any license" and for the imposition of costs or fines in excess of five hundred dollars.[46]  However, the pertinent regulations appear to conflict to some degree, and are also inconsistent with La. R.S. 37:3289. For example, 46 La. Admin. Code, tit. 46, Pt LIX §

---

[43] La. R.S. 37:3288.  La. R.S. 37:3291(A)(2) makes it unlawful for any person to knowingly employ any individual to perform security officer duties who is not the holder of a valid registration card, and La. R.S. 37:3291(B)(1) and (3) make it unlawful for any person to knowingly provide or perform security services without a valid registration card and to carry a firearm in the performance of duties without a valid registration card.  La. R.S. 37:3292 provides that willful violations result in a fine of not less than one hundred dollars nor more than five hundred dollars, or imprisonment of not less than ten days or more than five months, or both.

[44] La. Admin. Code tit. 46, Pt LIX, §903(C).  There is also a penalty of $50 for a licensee's failure to have a registrant in its employ trained within the prescribed time period, with such penalty accumulating at a daily rate not to exceed $500, if the registrant is not trained within 14 days after the deadline date.  *Id.*

[45] La. R.S. 37:3289(A)(9).

[46] La. R.S. 37:3289(C).

8

601(A), "Contested Proceedings," does not always require a vote of the Board for license revocation:

> A. Before revoking or suspending a license or registration card, or imposing fines or costs over $500, the board will afford the applicant an opportunity for a hearing after reasonable notice of not less than 15 days, **except in a case of a failure to maintain the required insurance or when a registrant is found carrying an unauthorized weapon while performing the duties of a security officer.**[47]

*But see* La. Admin. Code tit. 46, Pt LIX, §801(A), which provides that the Board can revoke a license "upon the vote of four concurring members when it finds that the licensee or business entity is unsuitable for the purpose of its license or endangers the health, safety, or welfare of the citizens of the state." *And see* 46 La. Admin. Code, tit. 46, Pt LIX, § 901(A), referenced above, which authorizes imposition of a fine and license revocation upon a finding by the Board of a violation "after reasonable notice and opportunity for a fair and impartial hearing held in accordance with the Administrative Procedure Act."

According to the APA, for adjudications,[48] "all parties who do not waive their rights shall be afforded an opportunity for hearing after reasonable notice," and further, "[o]pportunity shall be afforded all parties to respond and present evidence on all issues of fact involved and argument on issues of law and policy involved and to conduct such cross-examination as may be required for a full and true disclosure of the facts."[49]  Notably:

---

[47] Emphasis added.

[48] "Adjudications" are defined as including the agency's process for the formulation of a decision or order. La. R.S. 49:951(1).  "Agencies" include state boards, commissions, departments, agencies, officers or other entities which make rules, regulations, policies, or formulates or issues decisions or orders pursuant to, or as directed by, or in implementation of the constitution or laws of the United States or the constitution and statutes of Louisiana.  La. R.S. 49:951(2).  "Decision" or "order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency, in any matter other than rulemaking, required by constitution or statute to be determined on the record after notice and opportunity for an agency hearing, and including non-revenue licensing, when the grant, denial, or renewal of a license is required by constitution or statute to be preceded by notice and opportunity for hearing.  La. R.S. 49:951(3).

[49] La. R.S. 49:955 (A) and (C).

> No revocation, suspension, annulment, or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gives notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee is given an opportunity to show compliance with all lawful requirements for the retention of the license. **If the agency finds that public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action.** These proceedings shall be promptly instituted and determined.[50]

## B. Section 1983 Claims

### 1. North Atlantic Has a Protected Interest in its License

The Fourteenth Amendment to the U.S. Constitution provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"[51] In order to state a claim for a due process violation, North Atlantic must allege (1) the deprivation of a protected property or liberty interest, that (2) occurred without due process of law.[52] As to the first requirement:

> The Supreme Court has explained that for purposes of the due process clause, property interests are created and defined by existing rules or understandings that stem from an independent source such as state law. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The Court further stated that a protected property interest requires more than a person's abstract need, desire, or unilateral expectation of it; one must instead have a legitimate claim of entitlement to the property interest. *Id.* In addition, although the existence of a property interest must be decided initially by reference to state law, federal constitutional law determines whether that interest rises to the level of entitlement protected by the due process clause. *Shawgo v. Spradlin*, 701 F.2d 470, 475 (5th Cir. 1983) (citing *Winkler v. Cnty. of DeKalb*, 648 F.2d 411, 414 (5th Cir. 1981)).
>
> ... Regarding the meaning of a 'protected property interest,' 'the hallmark of property ... is an individual entitlement grounded in state law, which

---

[50] La. R.S. 49:961(C) (emphasis added).
[51] U.S. Const. amend. XIV, § 1.
[52] *Holden v. Perkins*, 398 F. Supp. 3d 16, 23 (E.D. La. Aug. 15, 2019), *citing Grimes v. Pearl River Valley Water Supply Dist.*, 930 F.2d 441, 444 (5th Cir. 1991)).

cannot be removed except 'for cause'.' *Findeisen v. N.E. Indep. School Dist.*, 749 F.2d 234, 237 (5th Cir. 1984). A property interest is created when a person has secured an interest in a specific benefit to which the individual has 'a legitimate claim of entitlement.' *Bd. of Regents of State Colls., v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). However, the interest must be more than an 'abstract need or desire' or a 'unilateral expectation' of the benefit. *Id.*[53]

"'Privileges, licenses, certificates, and franchises ... qualify as property interests for purposes of procedural due process.'"[54] "This is because, once issued, a license or permit 'may become essential in the pursuit of a livelihood.'"[55] "Because permits and licenses relate to the maintenance of a person's livelihood, '[s]uspension of issued licenses ... involves state action that adjudicates important interests of the licensees.'"[56] "Therefore, once issued, a license or permit cannot be taken away by the State without due process."[57]

It is clear from the foregoing that North Atlantic has a constitutionally-protected property interest in its previously-approved license to operate a private security business.[58] North Atlantic's claim that it was deprived of due process when its license was revoked prior to notice and a hearing before the Board is discussed below, in the context of immunity.[59]

---

[53] *Fetty v. Louisiana State Bd. of Private Sec. Examiners,* No. 18-517, 2020 WL 448231, at *10 (M.D. La. Jan. 28, 2020), *citing Holden*, 398 F. Supp. 3d at 22-23.

[54] *Fetty*, 2020 WL 448231 at *10, *citing Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012) (*quoting Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977)).

[55] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*quoting Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L.Ed.2d 90 (1971)).

[56] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*quoting Bell*, 402 U.S. at 539, 91 S. Ct. 1586); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood.")).

[57] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*citing Bell*, 402 U.S. at 539).

[58] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*quoting Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977)). *See also Copsey v. Swearingen,* 36 F.3d 1336, 1341 (5th Cir. 1994): "There is no doubt that property rights created under state law are protected by the Fourteenth Amendment. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)."

[59] R. Doc. 25, ¶¶ 19, 21; R. Doc. 32, p. 1.

### 2. Blache Is Not Entitled to Absolute or Qualified Immunity as to North Atlantic's Due Process Claims at this Time

#### a. Absolute Immunity

Blache argues that he is entitled to absolute immunity because he initiated administrative proceedings against North Atlantic and is, therefore, shielded from North Atlantic's Section 1983 claims.  In support, Blache relies on the six factors enumerated in *Butz v. v. Economou,* and examined in *Beck v. Texas Board of Dental Examiners* (the "*Butz* factors").[60]  With respect to the first *Butz* factor, Blache construes his activities as "initiating proceedings" against North Atlantic, which Blache contends is "very much like the prosecutor's decision to initiate or move forward with a criminal prosecution," and "as such, it is imperative that officials exercise their discretion to initiate administrative proceedings free from the threat of incurring personal liability."[61]  As for the second, fifth, and sixth *Butz* factors, Blache argues that there are number of safeguards in place with respect to Board proceedings that reduce the need for private damages, such as the right to counsel, to conduct discovery, *etc*. and the fact that the APA provides the right to judicial review to correct errors on appeal, all of which are adversarial in nature.  As for the third *Butz* factor, North Atlantic argues that the Board and its members are insulated from political influence because they are appointed by the Governor and confirmed by the Senate.  Further, they only serve two terms, and Blache is prohibited from having any interest in a security services business during his tenure and for five years thereafter.[62]  Blache contends that these five *Butz* factors favor a finding

---

[60] R. Doc. 27-1, pp. 2-4, *citing Beck,* 204 F.3d 629, 634 (5th Cir. 2000) (enumerating the following *Butz* factors, and noting that no one factor is controlling: (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) insulation from political influence; (4) the importance of precedent; (5) the adversary nature of the process; and (6) the correctability of error on appeal)(*citing Butz,* 438 U.S. 478, 51 (1978).
[61] R. Doc. 27-1, p. 3, *citing Butz*, 438 U.S. 478 and *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d 62, 66 (5th Cir. 1997).
[62] R. Doc. 27-1, pp. 3-4.  Blache contends that the fourth factor is neutral but argues that the U.S. Court of Appeals for the Fifth Circuit has held that the fourth factor is not controlling and is overshadowed by the "convincing nature of five other variables," *citing O'Neal*, 113 F.3d 66.

that Blache is entitled to absolute immunity in light of this Court's holding in *McQueary-Layne v. Bd. of Nursing*.[63]

In response, North Atlantic argues that Blache engaged in both investigative and prosecutorial functions when he investigated Rivers' verbal complaint, (which should have been in writing), and revoked North Atlantic's license (which exceeded Blache's authority).  Citing the U.S. Supreme Court's decision in *Buckley v. Fitzsimmons,* North Atlantic argues: "where there is a mixing of investigative and prosecutorial functions, there can be no absolute immunity."[64] According to North Atlantic, per *Buckley*, when prosecutors act as investigators searching for clues and corroboration that might give them probable cause to recommend arrest, those types of activities are not subject to absolute immunity.  North Atlantic argues that Blache's liability is more properly evaluated in the context of qualified immunity (discussed *below*).[65]

Blache replies that he did not conduct any "investigations" under the facts of *Buckley*. Rather, Blache "received information regarding a rules violation and then took affirmative steps to independently verify the accuracy of the allegations."  Blache argues that these acts "were intimately related to his decision to initiate administrative proceedings," and were prosecutorial in nature.  Blache also argues that North Atlantic's reliance on *Buckley* is flawed because the prosecutors in *Buckley* were not given absolute immunity due to misconduct during their investigation, not because their activities were investigative.  Blache contends that his acts "pale in comparison to those of the prosecutors in *Buckley*," as he did not engage in wrongdoing.[66]

---

[63] North Atlantic cites "No. 18-632, [] (M.D. La. 2019)" for Judge Brian Jackson's decision on the first round of motions to dismiss in *McQueary-Lane v. Bd. Of Nursing*.  However, the citation is No. 18-632, (M.D. La. Apr. 8, 2019) at R. Doc. 46 of that docket, pp. 13-15.

[64] R. Doc. 32, p. 6, *citing Buckley*, 509 U.S. 259 (1993).

[65] R. Doc. 32, pp. 6-7.   Blache argues that North Atlantic did not address Blache's immunity arguments, and thus "these claims should also be deemed as waived and dismissed with prejudice," *see* R. Doc. 36, p. 1. However, North Atlantic offered argument and legal authority in response to Blache's claims of immunity. R. Doc. 32, pp. 6-9. Indeed, Blache responded to North Atlantic's absolute immunity arguments in his reply memorandum.  R. Doc. 36, p. 2.

[66] R. Doc. 36, p. 2.

Absolute immunity "denies a person whose federal rights have been violated by a government official any type of remedy, regardless of the conduct."[67]  As a result, the Supreme Court has been "quite sparing" in recognizing absolute immunity.[68]  Government officials to whom absolute immunity is extended "include judges performing judicial acts within their jurisdiction, prosecutors in the performance of their official functions, and certain 'quasi-judicial' agency officials who, irrespective of their title, perform functions essentially similar to those of judges or prosecutors, in a setting similar to that of a court."[69]  In determining whether absolute immunity extends to a particular government official, "the proper focus should not be the identity of the party claiming the immunity, but rather his 'role in the context of the case.'"[70]  Under this "functional approach" to the application of absolute immunity, the United States Court of Appeals for the Fifth Circuit has directed courts to analyze the "nature of the function performed" by the government official.[71]  "In other words, immunity attaches to particular official functions, not to particular offices."[72]

Absolute immunity extends to officials whose responsibilities are functionally comparable to those of judges and prosecutors.[73]  The Fifth Circuit has recognized absolute immunity for officials that are members, attorneys, and directors of professional licensing boards.[74]  However, when a member, attorney, or director of a professional licensing board performs an "investigative" function, as opposed to "either an adjudicative or prosecutorial function," that person is not entitled

---

[67] *O'Neal*, 113 F.3d at 65.

[68] *Beck,* 204 F.3d at 634, *citing Forrester v. White,* 484 U.S. 219, 224 (1988).

[69] *O'Neal*, 113 F.3d at 65 (citations omitted).

[70] *O'Neal*, 113 F.3d at 65, *quoting Mays v. Sudderth*, 97 F.3d 107, 110 (5th Cir. 1996).

[71] *Beck*, 204 F.3d at 634.

[72] *O'Neal*, 113 F.3d at 65 (citations omitted).

[73] *O'Neal*, 113 F.3d at 67.

[74] *See, e.g.*, *Di Ruzzo v. Tabaracci*, 480 Fed.Appx. 796 (5th Cir. 2012) (recognizing absolute immunity for attorneys and board members of the Texas Medical Board); *Beck*, 204 F.3d 629 (recognizing absolute immunity for board members of the Texas State Board of Dental Examiners); and *O'Neal*, 113 F.3d 62 (recognizing absolute immunity for board members and the director of the Mississippi State Board of Nursing).

to absolute immunity.[75] "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'"[76]

Accepting the factual allegations in the operative Complaint as true, North Atlantic alleges that Blache "*conducted* an unannounced *inspection*" of Lands while he was on his North Atlantic post, and "*found* that he did not have his proper paperwork on his person and that his firearm's certification had expired…."[77] Likewise, Blache avers that, while "*[a]cting on a tip*, Blache *discovered* that Lands was not carrying his registration card and was no longer registered to carry a firearm while on duty."[78] Blache's function in "acting on a tip" to find out if there was a violation was investigative in nature.[79] Notably, the Board's authority to examine "alleged violations by a licensee or registrant as a result of a complaint"[80] arises out of La. R.S. 37:3274(A)(9) (*see* above) and La. Admin. Code tit. 46, Pt LIX, §805(A) and (B), which, by its own terms, defines such examinations as investigations: "The board may **investigate** the actions of any licensee. The **investigation** shall be conducted for the purpose of determining whether a licensee is in compliance with R.S. 37:3270-3298" and the Board's regulations.[81] Even Blache's characterization of his own acts, *i.e.*, "he received information regarding a rules violation and then took affirmative steps to independently verify the accuracy of the allegations,"[82] indicates that

---

[75] *Beck*, 204 F.3d at 637.

[76] *See Buckley*, 509 U.S. at 273, *quoting Hampton v. City of Chicago*, 484 F.2d 602, 608 (7th Cir. 1973).

[77] R. Doc. 25, ¶ 10 (emphasis added).

[78] R. Doc. 27-1, p. 2 (emphasis added). According to the Board's regulation at La. Admin. Code tit. 46, Pt LIX, § 105(B), complaints to the Board "shall be in writing" and signed by the individual making the complaint, and "include a means by which to contact the individual for investigative purposes." Thus, it appears that Rivers' tip was required to be in writing but was not, according to Plaintiff. R. Doc. 25, ¶ 9.

[79] *See Beck,* 204 F.3d at 636, denying absolute immunity to defendant Pitcock because "The record reveals that Pitcock performed investigative, not adjudicative nor prosecutorial functions."

[80] La. Admin. Code tit. 46, Pt LIX, §805(B).

[81] La. Admin. Code tit. 46, Pt LIX, §805(A) (emphasis added). *See also* La. R.S. 37:3274(A)(9). It is not clear from the provisions reviewed in connection with this Ruling and Order whether Blache was authorized to conduct an investigation.

[82] R. Doc. 36, p. 2.

those acts were investigative. To "investigate" is:  "to examine, study, or inquire into systematically; search or examine into the particulars of; examine in detail," or "to search out and examine the particulars of in an attempt to learn the facts about something hidden, unique, or complex, especially in an attempt to find a motive, cause, or culprit."[83]

Blache's actions in imposing the monetary fine and revoking North Atlantic's license may have been quasi-judicial[84] in nature, but as North Atlantic points out,[85] the fine and immediate revocation may not have been within the scope of Blache's authority, as several of the pertinent provisions require notice and a Board hearing prior to the imposition of these penalties.[86]  North Atlantic alleges that Blache's immediate imposition of the fine and revocation were contemporaneous with, and directly flowed from, Blache's investigation, so it is unclear whether Blache's role ever transitioned from that of investigator.  Blache's role may have been both investigative *and* quasi-judicial in nature, which defeats absolute immunity.[87]  At this juncture, Blache has not established that he is entitled to absolute immunity for actions that it is not clear he was personally authorized to take, and which actions he may have taken while still functioning as an investigator, rather than an administrator. Additionally, the underlying protections that make absolute immunity warranted for quasi-judicial functions, as articulated in *Butz*, were not present

---

[83] https://www.dictionary.com/browse/investigate.

[84] *See O'Neal,* 113 F.3d at 66 (holding that the Mississippi State Board of Nursing and its members "were acting in their 'quasi-judicial' *i.e.,* adjudicatory, capacity when they revoked the plaintiffs' licenses.").

[85] R. Doc. 32, p. 7.

[86] The authority pursuant to which Blache acted is unclear, as the Board decision and the cease and desist order are not in the record.

[87] *Beck*, 204 F.3d at 637, *and e.g.*, *Buckley*, 509 U.S. at 273–74 ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' *Hampton v. Chicago,* 484 F.2d 602, 608 ….")

in Blache's actions, as alleged.[88]  In *Butz*, the Supreme Court noted that malicious actions by judges are held in check by "[t]he insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process and the correctability of error on appeal …."  North Atlantic's allegations against Blache are that he acted immediately, rather than engaging in the process provided for under the applicable rules and procedures that would have given North Atlantic the opportunity to defend itself when the defense was still meaningful. While Blache may have absolute immunity for any adjudicatory or prosecutorial functions he takes on behalf of the Board, he has not established that he was engaged in those roles when he took the actions at issue in this case.[89]

---

[88] Blache also argues that these safeguards reduce the need for private damages. R. Doc. 27-1, p. 3.  The thrust of North Atlantic's argument, however, is that the safeguards were not available when Blache took his unilateral action and, by the time of the hearing, the damage was done.

[89] *Beck, O'Neal, and McQueary-Lane* are distinguishable.  In *Beck*, the members of the Board and the Board were given absolute immunity for engaging in quasi-judicial functions after having revoked the plaintiff's dental license, but the revocation was preceded by a formal complaint and a hearing, which led to the plaintiff's civil suit.  Thus, the plaintiff was provided a hearing and all of the procedural safeguards afforded by the Texas State Board of Dental Examiners' regulations prior to revocation.  The Fifth Circuit analyzed the *Butz* factors in light of the hearing and procedural safeguards provided the plaintiff.  *Beck,* 204 F.3d at 636.  Notably, a *Beck* defendant who engaged in investigative functions, Pitcock, was not afforded absolute immunity.  204 F.3d at 636.  Likewise, in *O'Neal and McQueary-Lane*, the nurses' licenses were revoked after Board hearings (and judicial review in *O'Neal*) and the courts analyzed the *Butz* factors in light thereof. 113 F.3d at 65-66; No. 18-632, (M.D. La. Apr. 8, 2019), R. Doc. 46, pp. 13-15.

   *b.  Qualified Immunity*

   Alternatively, Blache alleges that North Atlantic cannot show that Blache personally

violated a constitutional right that was clearly established at the time of the investigation, such that

Blache is entitled to qualified immunity.  First, Blache contends that North Atlantic cannot show

that Blache acted contrary to state law.  Blache argues that he was authorized to issue the cease

and desist order, and also acted in accordance with § 601 of the regulations, which "authorizes a

pre-hearing revocation when, like here, a security officer is found carrying an unauthorized

weapon."[90]  Blache further argues that even if he did not violate North Atlantic's clearly

established constitutional rights, "the defendant is entitled to qualified immunity if the conduct

was objectively reasonable."[91]  Blache contends that North Atlantic disputes the scope of § 601

and the meaning of "unauthorized weapon," and North Atlantic argues that Lands was not carrying

an "unauthorized weapon" at the time of the inspection because Lands' .38 revolver is on the list

of approved firearms.[92]  However, Blache argues that, even if .38 revolvers are on the list of

authorized firearms, Lands' revolver became unauthorized because Lands lacked the required

---

[90] R. Doc. 27-1, p. 5.  Blache contends that Section 1983 does not impose liability for violations of duties arising out of state law, *i.e.*, North Atlantic's state law claims are not viable under Section 1983.  R. Doc. 27-1, pp. 5-6 and R. Doc. 36, p. 3. However, throughout the Revised Complaint and its opposition memorandum, North Atlantic alleges federal constitutional violations.  R. Doc. 25, ¶¶ 19, 21-22 and R. Doc. 32, p. 1 (referencing Fourteenth Amendment due process rights and violation of the Eighth Amendment's excessive fines clause); p. 9 (referencing excessive fines clause of the Constitution and procedural due process under the Fourteenth Amendment); and p. 10 (referencing federally protected rights).  North Atlantic has asserted a Section 1983 claim under the due process clause of the Fourteenth Amendment and the excessive fines clause of the Eighth Amendment. As alleged, North Atlantic has a property interest in its state-issued license, which allows it to engage in the business of private contract security for its livelihood. *See Fetty*, 2020 WL 448231, at *11, *quoting Bowlby*, 681 F.3d at 220 (finding that plaintiff had a property interest in permits to operate a "Sno Cone" hut issued by a zoning board because they allowed her to "operate a business 'in the pursuit of a livelihood,'" and reversing district court's granting of motion to dismiss when permit was revoked without prior notice or hearing). Further, North Atlantic has alleged that Blache deprived it of a meaningful opportunity to respond before the hearing that was ultimately conducted.  R. Doc. 25, ¶¶ 17, 20.  Thus, North Atlantic has stated a viable claim, rooted in the Constitution, and Blache's motion on this issue is denied.  North Atlantic's authority at R. Doc. 27-1, p. 5., *e.g.*, *Evans v. City of Dallas*, 861 F.2d 846 (5th Cir. 1988), is factually distinguishable for the same reasons cogently explained in *Fetty*, 2020 WL 448231, at **11-12.
[91] R. Doc. 27-1, p. 6, *citing Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990), [*overturned on other grounds, see Manton v. Strain*, No. 09-0339, 2010 WL 4364552, at *6 (E.D. La. Oct. 21, 2010)(subsequent history omitted)].
[92] R. Doc. 27-1, p. 6, *and see* R. Doc. 25, ¶¶ 11, 18 and R. Doc. 32, p. 8.

credentials while carrying it.  In any case, Blache argues that, "Because reasonable officials could have differed on the meaning of the phrase 'authorized weapon' when North Atlantic's license was revoked, any constitutional rights were not clearly established."[93]

In response, North Atlantic contends Blache violated La. R.S. 37:3289 when he immediately revoked North Atlantic's license because the statute only authorizes the Board to revoke a license.[94]  North Atlantic additionally argues that Blache improperly revoked its license for a "minor violation," considering the applicable penalty.  According to regulation § 903(C), the penalty assessed against a licensee who allows a registrant to carry an unauthorized weapon while on duty is, at most, $100, which is much lower than the "clearly excessive" fine assessed against North Atlantic.  North Atlantic contends that Blache is not entitled to qualified immunity because Blache's actions were taken in violation of state and federal law, and "no reasonable official who could read English would believe he had the power to do this."[95]

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[96] "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' ... [which] is effectively lost if a case is erroneously permitted to go to trial."[97] "The doctrine of qualified immunity was created to balance the interest of compensating persons whose federally protected rights have been violated

---

[93] R. Doc. 27-1, p. 7, *citing Blackwell v. Barton,* 34 F.3d 298, 303 (5th Cir. 1994).
[94] R. Doc. 32, p. 8.
[95] R. Doc. 32, pp. 8-9.
[96] *Fetty*, 2020 WL 520026, at *10 (M.D. La. Jan. 31, 2020), *citing Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (*citing Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)).
[97] *Fetty,* 2020 WL 520026, at *10, *citing Khansari v. City of Houston*, 14 F. Supp. 3d 842, 853 (S.D. Tex. April 9, 2014) (other citations omitted*).*

against the fear that personal liability might inhibit public officials in the discharge of their duties."[98]

"In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known."[99] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[100] "'Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[101] "'Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.'"[102]

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'"[103] "'In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.'"[104] "'Of course, general statements of the law are not

---

[98] *Fetty*, 2020 WL 520026, at *10, *citing Khansari*, 14 F. Supp. 3d at 853, (*citing Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994)).

[99] *Fetty*, 2020 WL 520026, at *10, *citing Gobert*, 463 F.3d at 345 (*citing Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002)).

[100] *Fetty*, 2020 WL 520026, at *10 (citations omitted).

[101] *Fetty*, 2020 WL 520026, at *10, *citing Kisela v. Hughes*, ⸺ U.S. ⸺, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) (*quoting White v. Pauly*, ⸺ U.S. ⸺, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (alterations and internal quotation marks omitted)).

[102] *Fetty*, 2020 WL 520026, at *10, *citing Kisela*, 138 S. Ct. at 1152, (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).

[103] *Fetty*, 2020 WL 520026, at *10, *citing Kisela*, 138 S. Ct. at 1152 (*quoting White*, 137 S. Ct. at 551 (internal quotation marks omitted)).

[104] *Fetty*, 2020 WL 520026, at *10, *citing Kisela*, 138 S. Ct. at 1152 (*quoting White*, 137 S. Ct. at 551 (internal quotation marks omitted)).

inherently incapable of giving fair and clear warning to officers.'"[105] "But ... [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"[106] "That is a necessary part of the qualified-immunity standard[.]"[107]

Because Blache asserts qualified immunity, North Atlantic "bears the burden of pleading facts that demonstrate liability and defeat immunity."[108] To meet that burden and as set forth above, North Atlantic must allege facts showing that (1) Blache violated a statutory or constitutional right that was clearly established at the time of his conduct, and (2) Blache violated that right to the extent that an objectively reasonable person would have known.[109]

i.    <u>Whether Blache Violated a Clearly Established Right</u>

The pertinent allegations in the Revised Complaint regarding the deprivation and the lack of due process afforded are as follows: (1) Rivers and Blache viewed North Atlantic, a Mississippi company, as a threat because North Atlantic secured lucrative contracts in Louisiana; (2) Rivers or his agent told Lands to forego firearms refresher training in order for Rivers and Blache to engage in a "power play" and use Lands' lack of training to have North Atlantic's license revoked; (3) Rivers tipped Blache off about Lands' lack of refresher training so that North Atlantic's license would be revoked; (4) Blache investigated and found that Lands did not have his proper paperwork, as Lands' firearm's certification had expired three days prior to Blache's inspection; (5) Blache contacted North Atlantic and notified North Atlantic that "he was revoking their license for having a guard with an unauthorized weapon, grounds for immediate suspension of its license," and

---

[105] *Fetty,* 2020 WL 520026, at *11, *citing Kisela*, 138 S. Ct. at 1153 (*quoting White*, 137 S. Ct. at 552 (internal quotation marks omitted)).
[106] *Fetty,* 2020 WL 520026, at *11, *citing Kisela*, 138 S. Ct. at 1153 (*quoting Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014)).
[107] *Fetty,* 2020 WL 520026, at *11, *citing Kisela*, 138 S. Ct. at 1153.
[108] *Shaw v. Villanueva*, 918 F.3d 414, 416-17 (5th Cir. 2019).
[109] *Shaw*, 918 F.3d at 416-17; *Gobert*, 463 F.3d at 345 (*citing Hope*, 536 U.S. 730).

revoked North Atlantic's license, issued a fine of $9,500, and issued an immediate cease and desist order all that same day; and, significantly, (6) Blache "notified all of [North Atlantic's] clients that North Atlantic's license was revoked."[110]  There is no dispute that: Lands' firearms certification had lapsed and Lands was not in compliance with the law and regulations at the time of Blache's August 14, 2018 inspection; the revocation of North Atlantic's license was ultimately made effective on August 31, 2018; and, North Atlantic was given a hearing six days later on September 6, 2018, after which the Board ratified the license revocation and the fine.[111]

North Atlantic alleges it was initially deprived of property without Fourteenth Amendment procedural due process, and the post-deprivation Board hearing was inadequate because the actions of Blache caused North Atlantic to lose all of its Louisiana contracts and millions of dollars in potential revenue prior to the hearing.[112]  Blache contends that North Atlantic was given constitutionally-adequate due process via the September 6, 2018 hearing, after which the Board ratified Blache's actions.[113]  The regulations empower the Board to investigate licensees, and the regulations authorize Blache to "sign off on" cease and desist orders on behalf of the Board, which Blache may have had the authority to issue to North Atlantic.[114]  However, it is unclear if North Atlantic was afforded constitutionally-adequate due process when its license was revoked prior to the hearing.

---

[110] R. Doc. 25, ¶¶ 4-6, 9-12.

[111] R. Doc. 25, ¶¶ 8, 10, 15, 20; R. Doc. 27-1, p. 2.

[112] R. Doc. 25, ¶¶ 19, 21; R. Doc. 32, pp. 1, 9-10.

[113] R. Doc. 27-1, pp. 8-9.

[114] La. Admin. Code tit. 46, Pt LIX, § 103(H)(9), § 805(A).  It is unclear whether Blache had authority from the Board to issue the cease and desist order to North Atlantic at the time it was issued.  *See* R.S. La. 37:3293(A) ("In addition to or in lieu of the criminal penalties and administrative sanctions provided in this Chapter, **the board** is empowered to issue an order to any person or firm engaged in any activity, conduct, or practice constituting a violation of any provision of this Chapter, directing such person or firm to forthwith cease and desist from such activity, conduct, or practice. Such order shall be issued in the name of the state of Louisiana, under the official seal of the board.")(emphasis added).  While La. Admin. Code tit. 46, Pt LIX, § 103(H)(9) permits Blache to sign off on cease and desist orders, the statute seems to presuppose that the issuance of such orders is at the direction of the Board.

22

"'[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.'"[115] "The essential elements of ... procedural due process under the Constitution are notice and an opportunity to respond."[116] As to the opportunity to respond, "the Supreme Court has held that '[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'"[117] "Depending on the circumstances and the interests at stake, a fairly extensive evidentiary hearing may be constitutionally required before a legitimate claim of entitlement may be terminated."[118] "In other circumstances, however, the Supreme Court has upheld procedures affording less than a full evidentiary hearing if some kind of hearing ensuring an effective initial check against mistaken decisions is provided before the deprivation occurs and a prompt opportunity for complete administrative and judicial review is available."[119] [120]

Thus, when a property interest is taken, "some form of hearing is required" before a final deprivation of interest,[121] which, as mentioned, is required to be "at a meaningful time and in a meaningful manner."[122]  In most cases, "a meaningful time" means prior to the deprivation of the

---

[115] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*quoting Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975, 108 L.Ed.2d 100 (1990)).

[116] *Fetty,* 2020 WL 448231 at *10, *citing Richmond v. Coastal Bend College Dist.*, 883 F. Supp. 2d 705, 713 (S.D. Tex. Aug. 1, 2012) (*citing Finch v. Fort Bend Independent School Dist.*, 333 F.3d 555, 562 (5th Cir. 2003)).

[117] *Fetty,* 2020 WL 448231 at *10, *citing Bowlby*, 681 F.3d at 220 (*quoting Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976) (quotation marks and citation omitted)).

[118] *Fetty,* 2020 WL 448231 at *10, *citing Richmond*, 883 F. Supp. 2d at 713 (*citing Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 261, 107 S. Ct. 1740, 1747, 95 L.Ed.2d 239 (1987)).

[119] *Fetty,* 2020 WL 448231 at *10, *citing Richmond*, 883 F. Supp. 2d at 713 (*citing Brock*, 481 U.S. at 261–62).

[120] *See Mathews v. Eldridge,* 424 U.S. 319, 334-35, 96 S. Ct. 893, 903, 47 L.Ed.2d 18 (1976) ("[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.")

[121] *Mathews,* 424 U.S. at 333, *citing Wolff v. McDonnell*, 418 U.S. 539, 557-58, 94 S. Ct. 2963, 41 L.Ed.2d 935 (1974).

[122] *Mathews,* 424 U.S. at 333, *citing Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L.Ed.2d 62 (1965). *See also Sahara Health Care, Incorporated v. Azar*, 975 F.3d 523, 530 (5th Cir. 2020), *citing Jones v. Louisiana Bd. of Sup'rs of University of Louisiana Systems*, 809 F.3d 231, 236 (5th Cir. 2015) ("The type of hearing necessary—the process due—is a function of the context of the individual case.")

liberty or property right at issue.[123] When the State must act quickly or pre-deprivation process is impracticable, and meaningful post-deprivation process is available, then due process is still satisfied.[124] Thus, when the deprivation of a protected liberty or property interest is the "result of a random and unauthorized act by a state employee," which the State cannot foresee, post deprivation process is sufficient.[125]

Construing the facts in the light most favorable to North Atlantic, North Atlantic may have been afforded some degree of due process because it was ultimately given a hearing and the Board apparently ratified the actions taken, but that is not the end of the inquiry.  It is not clear whether Blache's immediate license revocation (despite that the revocation was subsequently made effective two weeks later), notification to North Atlantic's clients, and the imposition of the $9,500 fine were actions Blache was authorized to take or whether the hearing was *constitutionally adequate* due process, because North Atlantic contends that the immediate revocation and notification of same to its clients is what caused North Atlantic's damages.  According to North Atlantic, the post-deprivation hearing was inadequate because the damage to North Atlantic's business had already been done, and North Atlantic's competitors had already assumed all of North Atlantic's contracts by the time of the hearing.[126]  Further, some of the relevant statutes and

---

[123] *Zinermon,* 494 U.S. at 127; *see also Caine v. Hardy,* 943 F.2d 1406, 1411–12 (5th Cir. 1991) ("Ordinarily, government may effect a deprivation only after it has accorded due process ....")

[124] *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986).

[125] *Parratt,* 451 U.S. at 538-41; *see also Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Zinermon,* 494 U.S. at 132; *Brooks v. George Cnty., Miss.,* 84 F.3d 157, 165 (5th Cir. 1996).  *See also Copsey*, 36 F.3d at 1342: "Even if one assumes *arguendo* that Copsey does have a state property right by virtue of section 333, he has not shown that he has been deprived of it *without due process of law.* When a plaintiff alleges that he has been deprived of property because of the random and unauthorized acts of government officials and seeks a post-deprivation remedy, there is no denial of due process if the state provides adequate post-deprivation remedies. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Caine v. Hardy,* 943 F.2d 1406 (5th Cir.1991) (en banc)."

[126] R. Doc. 25, ¶¶ 13-14, 17, 20, 26.  North Atlantic also argues that some of the companies that took over North Atlantic's contracts were also Board members, which poses a conflict of interest. R. Doc. 25, ¶ 14.  It is unclear who sat on the Board at the time of the decision, but *see also* the APA, La. R.S. 49:960 ("A subordinate deciding officer

regulations indicate that the revocation should have occurred *after* notice and a hearing.[127] Whether there was an adequate basis for Blache's actions cannot be determined at this time, however, because the cease and desist order issued to North Atlantic, and the Board's reasons for ruling at the September 6, 2018 hearing, one or both of which presumably specifies the laws or Board regulations North Atlantic allegedly violated, is not in the record, and there is a factual dispute about the adequacy of the post-deprivation remedy.[128] For qualified immunity purposes, however, North Atlantic has sufficiently alleged that Blache violated its established rights to Fourteenth Amendment due process, such that North Atlantic's claims survive the first prong of the qualified immunity analysis on a motion to dismiss.

---

or agency member must withdraw from any adjudicative proceeding in which he cannot accord a fair and impartial hearing or consideration.")

[127] Several apparently relevant provisions of the applicable law, Board regulations, and the APA, all reproduced above, contemplate that notice and a hearing should have occurred prior to the imposition of the fine and the revocation of North Atlantic's license. However, not all of the referenced provisions require prior notice and a hearing. *Compare* La. R.S. 37:3288(A)(1)(e),which presupposes notice and a hearing prior to the revocation of a license and a $5,000 fine per violation for the "egregious act" of "[o]perating a private security business without obtaining the required firearms training" and Board Regulation § 901(A), which correlates to La. R.S. 37:3288 and which also presupposes notice and a hearing prior to license revocation or imposition of a $500 fine, *with* La. R.S. 49:961(C), which authorizes immediate action by the Board (albeit a suspension, not a revocation) when there is a finding of an emergency situation affecting public safety and health. *See also* 46 La. Admin. Code, tit. 46, Pt LIX, § 601(A), which, on its face, suggests that prior notice and a hearing are not required prior to revocation of a license and imposition of a $500 fine "when a registrant is found carrying an unauthorized weapon while performing the duties of a security officer." However, the undersigned takes no position on whether any of these particular provisions are applicable, or the propriety of the regulations in light of the law, because there is not enough information in the record regarding the specific infractions for which North Atlantic's license was revoked.

[128] The Revised Complaint alleges that Blache notified North Atlantic that "he was revoking their license for having a guard with an unauthorized weapon, grounds for immediate suspension of its license," and "Blache compounded his liability when he testified at the hearing that NAS was due an immediate revocation because its guard used an 'unauthorized weapon at his post," which appears to implicate regulation § 601. R. Doc. 25, ¶¶ 11, 27. Likewise, in the Motion, Blache contends that he was authorized to revoke the license pursuant to § 601. R. Doc. 27-1, p. 5. However, there is no independent evidence from the Board as to the laws and/or regulations that North Atlantic was ultimately determined to have violated.

ii.     Whether Blache Acted Objectively Reasonable

North Atlantic has also adequately alleged that Blache's conduct may not have been objectively reasonable.  North Atlantic contends that Blache, the "main bad actor,"[129] conspired to put North Atlantic out of business, as evidenced by Blache's immediate notification to all North Atlantic's clients of the license revocation.  North Atlantic contends that Blache providing immediate notice of the revocation to North Atlantic's clients is what destroyed North Atlantic's business and caused North Atlantic to lose all of its clients, in some cases to the businesses run by other Board members,[130] before North Atlantic had the opportunity to address the claims and present a defense.  It is unclear if Blache's notification of the revocation to North Atlantic's clients is a standard practice of the Board.  North Atlantic has also raised a question as to the severity of the penalties imposed on North Atlantic in light of the significantly lower administrative penalties set out in the regulations, which suggest that Lands' failure to have his firearms refresher training was only a minor infraction.  At this point, North Atlantic has sufficiently alleged that Blache's actions may have deviated from standard practice because they were motivated by malicious intent.  This is sufficient to allege that Blache did not act objectively reasonably so as to survive the second prong of the qualified immunity analysis.

**3.  North Atlantic Has Stated a Due Process Claim Against Blache**[131]

Blache argues that North Atlantic has failed to state a due process claim because, after the cease and desist order was issued, North Atlantic: "received a swift hearing;" the "temporary revocation" of the license was ultimately made effective August 31, 2018; and, the hearing, at

---

[129] While North Atlantic originally named Rivers as a defendant, North Atlantic's Opposition clarifies that North Atlantic now believes Blache is "the main bad actor" and North Atlantic subsequently dismissed Rivers from this action.  R. Doc. 32, p. 10; R. Docs. 37, 40.

[130] R. Doc. 25, ¶ 14.

[131] Blache does not explicitly argue that North Atlantic failed to state a claim for violation of the Eighth Amendment's prohibition of excessive fines.  However, *see* the Eighth Amendment discussion, *infra*.

which the Board ratified Blache's actions, occurred six days later.  Thus, "the basic tenets of due process were satisfied."[132]

Given the ambiguities as to the actual laws/regulations North Atlantic was found to have violated, the Board's findings in this case, the Board's practices with respect to notification of a licensee's clients, and the Board's rulings and assessed penalties in other cases for similar infractions, it is improper to dismiss North Atlantic's Fourteenth Amendment claim at the pleading stage.  Taking as true North Atlantic's allegations that Blache conspired against it and improperly notified its clients, North Atlantic has stated a plausible claim for relief for Blache's alleged conduct. The post-deprivation remedy was not adequate because Blache notified North Atlantic's clients of the license revocation before the hearing and, by the time of the hearing, the contracts were lost.  Additionally, although Blache argues that the *Parratt-Hudson* doctrine applies,[133] that doctrine would not apply unless Blache's actions were "random and unauthorized."[134]  To the contrary, Blache argues that his actions were specifically authorized.[135]

---

[132] R. Doc. 27-1, pp. 8-9, *citing Barry v. Barchi*, 443 U.S. 55, 64, 99 S. Ct. 2642, 2650, 61 L.Ed.2d 365 (1979).

[133] The *Parratt-Hudson* doctrine provides that the random and unauthorized deprivation of a plaintiff's property does not violate procedural due process if there is an adequate post-deprivation remedy. *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005).  *See Stotter v. Univ. of Texas at San Antonio,* 508 F.3d 812, 821–22 (5th Cir. 2007) ("Under the *Parratt/Hudson* doctrine 'an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.' *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The key word is 'unauthorized.' The Supreme Court later clarified that if the deprivation was authorized by the state and the state had an opportunity to provide some type of pre-deprivation remedy, failure to do so implicates the due process clause. *Zinermon v. Burch*, 494 U.S. 113, 127–30, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). In applying *Zinermon*, this circuit has held that a § 1983 action for deprivation of procedural due process is barred if a state has adequate post-deprivation remedies and the following conditions exist: (1) the deprivation must truly have been unpredictable or unforeseeable; (2) pre-deprivation process would have been impossible or impotent to counter the state actors' particular conduct; and (3) the conduct must have been unauthorized in the sense that it was not within the officials' express or implied authority. *Caine v. Hardy*, 943 F.2d 1406, 1413 (5th Cir.1991) (*en banc*). Otherwise, a § 1983 action for deprivation of procedural due process is not barred under the *Parratt/Hudson* doctrine.")

[134] *Woodard*, 419 F.3d at 354 (reversing district court dismissal of due process claim based on *Parratt-Hudson* doctrine, finding that the acts about which the plaintiff complained were not random or unauthorized such that the court erred in applying the doctrine).

[135] R. Doc. 27-1, p. 5 ("The allegations of the complaint show that Blache complied with Board regulations when he revoked North Atlantic's license.")

The Motion will be denied to the extent that North Atlantic has sufficiently stated a Fourteenth Amendment due process violation. Blache's arguments may, however, be reurged at the summary judgment stage or at trial.[136]

### 4. The Motion is Denied as to the Eighth Amendment Excessive Fine Claim Because a Fact-Intensive Inquiry Into Proportionality is Not Appropriate on a Motion to Dismiss

North Atlantic asserts that the Board's imposition of the $9,500 fine, and the loss of its business contracts and potential revenue, were excessive fines in violation of the Eighth Amendment.[137] The Motion generally argues that absolute immunity shields Blache from North Atlantic's claims that Blache violated its constitutional rights.[138]

The Eighth Amendment to the U.S. Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed ..."[139] The Eighth Amendment does not apply of its own force to the States.[140] However, the Supreme Court has recently held:

> Like the Eighth Amendment's proscriptions of "cruel and unusual punishment" and "[e]xcessive bail," the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority. This safeguard, we hold, is "fundamental to our scheme of ordered liberty," with "dee[p] root[s] in [our] history and tradition." *McDonald* v. *Chicago*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (internal quotation marks omitted; emphasis deleted). **The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.**[141]

---

[136] *Fetty*, 2020 WL 448231, at *9, *citing In re Deepwater Horizon*, 739 F.3d 790, 799–800 (5th Cir. 2014) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.").

[137] R. Doc. 25, ¶ 21; R. Doc. 32, p. 1.

[138] R. Doc. 27-1, p. 2.

[139] U.S. Const. amend. VIII.

[140] *Cripps v. Louisiana Dept. of Agriculture and Forestry,* 819 F.3d 221, 234 (5th Cir. 2016), *citing Hinojosa v. Livingston,* 807 F.3d 657, 665, n. 5 (5th Cir. 2015).

[141] *Timbs v. Indiana,* 139 S. Ct. 682, 686–87, 203 L.Ed.2d 11 (2019) (emphasis added). *See also Wheelahan v. City of New Orleans,* No. 19-11720, 2020 WL 1503560, at *10 (E.D. La. Mar. 30, 2020) (recognizing *Timbs*).

"Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[142]

"[T]he phrase 'nor excessive fines imposed,' [] 'limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"[143]  The applicability of the Excessive Fines Clause does not depend on whether the fine is civil or criminal in nature, but "whether it is punishment."  If a civil sanction "cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes," it is a punishment.  In the excessive fines context, a fine may constitute punishment when, for example, it does not serve a remedial purpose such as replacing revenue lost by the government.[144] "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish." "If the amount of [fine] is grossly disproportional to the gravity of the [ ] offense, it is unconstitutional."[145]

The Fifth Circuit has held that an administrative agency's fine does not violate the Eighth Amendment—no matter how excessive the fine may appear—if it does not exceed the limits prescribed by the statute authorizing it.[146]  Therefore, to state an excessive fine claim under the

---

[142] *Timbs,* 139 S. Ct. at 687, *citing McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 765, 130 S. Ct. 3020, 177 L.Ed.2d 894 (2010).

[143] *Timbs,* 139 S. Ct. at 687, *citing U.S. v. Bajakajian*, 524 U.S. 321, 327–328, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (*quoting Austin* v. *United States*, 509 U.S. 602, 609–610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)).

[144] *Wheelahan,* 2020 WL 1503560 at *10, *citing Austin,* 509 U.S. at 609–10 (internal citations omitted) and *Bajakajian*, 524 U.S. at 342.

[145] *Wheelahan,* 2020 WL 1503560 at *10, *citing Bajakajian*, 524 U.S. at 334, 337.

[146] *See Cripps,* 819 F.3d at 234, *citing Newell Recycling Co., Inc. v. U.S. E.P.A.,* 231 F.3d 204, 210 (5th Cir. 2000).

Eighth Amendment, North Atlantic must plead facts showing that: (1) the fine was punitive in nature, and (2) the fine was disproportionate to the gravity of the offense.[147]

North Atlantic has sufficiently alleged that "the size of the fine suggests at least some element of deterrence or retribution and therefore may be considered a punishment."[148] However, no party has addressed whether lost revenue or potential lost revenue comes within the ambit of the Eighth Amendment as a "fine." As to the $9,500, the briefing and Revised Complaint suggest that the fine was assessed due to Lands' having an unauthorized weapon while on duty, which North Atlantic contends was excessive and/or grossly disproportionate to the gravity of the offense.[149] If the violation underlying the $9,500 fine was Lands' possession of an unauthorized weapon while on duty, it may be excessive and/or grossly disproportionate because the regulations provide for fines in the range of $50 to $100 for such a violation.[150] However, the pertinent statutes and regulations also provide for other potentially applicable fines and penalties, including La. R.S. 37:3288(A)'s assessment of $5,000 per day for "egregious" violations (one of which is arguably applicable here), but which can only be imposed after notice and a board hearing.[151] Because the statutory or regulatory provision pursuant to which the fine was assessed is not in the record, it is unclear if the fine imposed is grossly disproportionate or exceeds the limits prescribed by the statute authorizing it. As consideration of the proportionality of a fine "requires a fact-specific

---

[147] *Wheelahan,* 2020 WL 1503560, at *10 *and see Cripps,* 819 F.3d at 234, *citing Vanderbilt Mortg. and Finance Inc. v. Flores,* 692 F.3d 358, 374 (5th Cir. 2012) (*citing Bajakajian,* 524 U.S. at 334).
[148] *Wheelahan,* 2020 WL 1503560, at *11.
[149] R. Doc. 25, ¶¶ 21, 27 (referencing Blache's testimony at the hearing that immediate revocation was premised on Lands using an "unauthorized weapon" at his post); R. Doc. 32, pp. 1, 8; R. Doc. 27-1, pp. 6-7.
[150] La. Admin Code, tit 46, Pt. LIX, § 903.
[151] *See* La. R.S. 37:3288(A)(1)(e) (listing "operating a private security business without obtaining the required firearms training" as an example of an egregious violation).

evaluation of all the circumstances," the Motion will be denied because a fact-specific proportionality evaluation cannot be conducted at the motion to dismiss stage.[152]

### 5. Punitive Damages

North Atlantic's Revised Complaint seeks "punitive damages against…Defendants" "as a result of Blache's willful indifference to [North Atlantic's] federally protected rights."[153] "Punitive damages may be awarded [under § 1983] only when the defendant's individual conduct 'is "motivated by evil intent" or demonstrates "reckless or callous indifference" to a person's constitutional rights.'"[154]

Blache contends that he refrained from acting until he independently verified the allegations against North Atlantic. Blache argues that punitive damages require evil motive or intent or callous indifference to rights, but Blache's conduct did not rise to this level.[155] North Atlantic generally asserts that its license was revoked and a fine was imposed without a hearing and Board vote in violation of Louisiana law, which was then compounded by Blache's notification of the revocation to all of North Atlantic's clients, causing North Atlantic to lose millions in revenue. North Atlantic contends that Blache took these actions "in bad faith," with

---

[152] *Wheelahan,* 2020 WL 1503560, at *11, *citing U.S. v. Bieri,* 21 F.3d 819, 824 (8th Cir. 1994). *See also Cheffer v. Reno,* 55 F.3d 1517, 1524 (11th Cir. 1995) ("[W]ithout the facts of a particular violation, we cannot decide whether a specific fine will be excessive or punishment so cruel and unusual as to violate the Eighth Amendment."). As with the Fourteenth Amendment claim, Blache is not precluded from seeking summary judgment on this claim in the future and as applicable.

[153] R. Doc. 25, ¶ 22.

[154] *Fetty,* 2020 WL 448231, at *13 (M.D. La. Jan. 28, 2020), *citing Bouchereau v. Gautreaux,* No. 14-805, 2015 WL 5321285, at *13 (M.D. La. Sept. 11, 2015) (*quoting Williams v. Kaufman County,* 352 F.3d 994, 1015 (5th Cir. 2003) (citation omitted)). *See also Sockwell v. Phelps,* 20 F.3d 187, 192 (5th Cir. 1994), *citing Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) and *Thompkins v. Belt,* 828 F.2d 298, 301-302 (5th Cir. 1987). North Atlantic's state law claims do not give rise to punitive damages, as there are no applicable Louisiana statutes providing for same. "Punitive damages are not allowed under Louisiana law in absence of a specific statutory provision." *Fetty,* 2020 WL 448231 at *13, *citing Golden v. Columbia Cas. Co.,* No. 13-547, 2015 WL 3650790, at *9 (M.D. La. June 11, 2015) (*citing Hoffpauir v. Columbia Cas. Co.,* No. 12–403, 2013 WL 5934699, at *14 (M.D. La. Nov. 5, 2013) (other citations omitted)).

[155] R. Doc. 27-1, p. 9, *citing Smith,* 461 U.S. 30.

"willful indifference" to North Atlantic's federally-protected rights, and only "a plainly incompetent official or an evil one would commit such acts against a citizen."[156]

Having carefully considered the matter, the Motion will be denied with respect to this claim. North Atlantic has sufficiently alleged that Blache acted with reckless indifference to its constitutional rights. Blache is alleged to have been solely responsible for immediately revoking North Atlantic's license and imposing a $9,500 fine without a hearing, and then notifying all of North Atlantic's clients, which resulted in North Atlantic losing its Louisiana contracts prior to the hearing.[157] While the thrust of North Atlantic's Revised Complaint places much of the animus on Rivers, who has since been dismissed, the Revised Complaint also alleges that both Rivers and Blache conspired to revoke North Atlantic's license because they believed that the contracts should go to local companies.[158] Construing the facts in the light most favorable to North Atlantic, and considering the speed with which Blache allegedly acted, particularly with respect to notifying North Atlantic's clients of the revocation, a reasonable juror could find from all of these allegations (if true) that Blache acted with reckless indifference to North Atlantic's rights. However, as with the due process claim and the qualified immunity defense, North Atlantic will have to substantiate its claims for punitive damages with sufficient evidence if challenged by summary judgment and/or at trial.

## C. State Law Claims

### 1. Due Process Pursuant to Article I, Section 2 and La. R.S. 37:3289

North Atlantic's Revised Complaint also alleges that Blache violated North Atlantic's right to due process pursuant to Article I, Section 2 of the Louisiana Constitution, which, like its federal

---

[156] R. Doc. 32, pp. 9-10.
[157] R. Doc. 25, ¶¶ 10-13, 17, 19-20.
[158] R. Doc. 25, ¶¶ 4, 6, 9.

counterpart,  provides that "No person shall be deprived of life, liberty, or property, except by due

process of law."[159]  This claim is directly related to North Atlantic's claim that Blache violated La.

R.S. 37:3289, which requires a Board vote prior to license revocation.  Louisiana law also

recognizes a protected property interest in a license.[160]  As "[t]he Louisiana constitutional clauses

are 'substantially equivalent' to federal clauses [], courts 'apply the same analysis to [a]

plaintiff['s] state and federal claims.'"[161]  Accordingly, the Fourteenth Amendment due process

analysis above applies to North Atlantic's s due process claim under the Louisiana Constitution,

and for the same reasons set forth above, North Atlantic has sufficiently alleged, at this point, that

it was not afforded constitutionally-adequate due process.

## 2.  State Law Discretionary Immunity

Blache asserts that he is entitled to discretionary immunity pursuant to La. R.S. 9:2798.1,

which provides:

> Liability shall not be imposed on public entities[162] or their officers
> or employees based upon the exercise or performance or the failure
> to exercise or perform their policymaking or discretionary acts when

---

[159] La. Const. art. I, § 2.

[160] *See, e.g. Haygood v. Louisiana State Bd. of Dentistry,* 2011-1327 (La. App. 4 Cir. 9/26/12), 101 So.3d 90, 96–97, *writ denied*, 2012-2333 (La. 12/14/12), 104 So.3d 445 ("It is unquestionable that Dr. Haygood has a protected property right in his license to practice dentistry and that he is entitled to due process of law under both the federal and state constitutions," *citing Banjavich v. Louisiana Licensing Bd. For Marine Divers*, 237 La. 467, 111 So.2d 505, 511 (La. 1959).

[161] *Miller v. Summit Health and Rehab Services, Inc.,* No. 16-1066, 2017 WL 2625123, at *6 (W.D. La. June 16, 2017), *citing Powers v. U.S.*, 783 F.3d 570, 577 (5th Cir. 2015) (*citing Board of Com'rs of Orleans Levee Dist. v. Department of Natural Resources v. Dep't of Natural Res.*, 496 So.2d 281, 291 (La. 1986)).  *See also N.S. v. City of Alexandria,* No. 09-0779, 2014 WL 4274108, at *5 (W.D. La. Aug. 28, 2014) ("In the words of the Louisiana Supreme Court, "[u]nlike Louisiana's provision on equal protection which is distinct from that provided in the Fourteenth Amendment, our due process guarantee in La. Const. Art. I, § 2 does not vary from the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Progressive Security Ins. Co. v. Foster*, 711 So.2d 675, 688 (La.1998); *see also Dupree v. Belton*, No. 10–1592, 2013 WL 701068, at *6 (W.D. La. Feb. 26, 2013). Thus, our analysis of Plaintiffs' due process claims under the Fourteenth Amendment to the federal Constitution also applies to the Plaintiffs' due process claim under Article I, § 2 of the Louisiana Constitution.")

[162] "Public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions. La. R.S. 9:2798.1(A).

such acts are within the course and scope of their lawful powers and
duties.

However, this immunity is not applicable to (1) acts or omissions which are not reasonably related
to the legitimate governmental objective for which the policymaking or discretionary power exists;
or (2) acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful,
outrageous, reckless, or flagrant misconduct.[163]  Thus, officers, officials, and employees of any of
Louisiana's state boards are, under certain circumstances, statutorily entitled to immunity from
liability "based upon the exercise or performance or the failure to exercise or perform their
policymaking or discretionary acts."[164]

When a defendant invokes this discretionary function immunity as an affirmative defense,
a court must initially determine whether the governmental agency had a choice or discretion
regarding whether to follow a particular course of action.[165]  If a statute, regulation, or policy
dictated the governmental agency's action, then immunity does not apply.[166]  However, if there
was no prescribed duty, the defendant must then introduce evidence at trial that the choice was
"grounded in 'social, economic, or political policy.'"[167] "[E]ven if certain of the alleged acts of
misconduct ... are discretionary acts and decisions as claimed by the defendants, we are unable to
determine through the exception of no cause action whether the defense will apply herein. Even
where discretion is involved, the court must determine whether the discretionary act is the kind

---

[163] La. R.S. 9:2798.1(C).
[164] *Fetty v. Louisiana State Bd. of Private Sec. Examiners,* No. 18-517-JWD-EWD, 2020 WL 520026, at **12–13
(M.D. La. Jan. 31, 2020), *citing* La. R.S. 9:2798.1(A), (B).
[165] *Fetty,* 2020 WL 520026 at *13, *citing Johnson v. Orleans Par. Sch. Bd.*, 2006-1223 (La. App. 4 Cir. 1/30/08), 975
So.2d 698, 709.
[166] *Fetty,* 2020 WL 520026 at *13, *citing Johnson,* 975 So.2d at 709–10.
[167] *Fetty,* 2020 WL 520026 at *13, *citing Johnson,* 975 So.2d at 710 (*quoting Simeon v. Doe,* 92-2353 (La. 5/24/93),
618 So.2d 848, 852–53).

which is 'grounded in social, economic or political policy,' a question of fact to be determined through a trial."[168]

Blache's Motion is denied on this issue. Even assuming it is appropriate to evaluate the "social, economic, or political policy" issue at the motion to dismiss stage (which is questionable),[169] it is not clear, for the reasons already explained, how much discretion Blache had and whether Blache was authorized to take the actions against North Atlantic that were taken, and thus, it is unclear whether Blache acted in an manner authorized by statute or regulation. It is also not clear from the Revised Complaint whether Blache's actions were grounded on any "social, economic, or political policy," in light of North Atlantic's allegations that Blache had a malicious or evil motive to revoke North Atlantic's license in order to put North Atlantic out of business, which is potentially evidenced by Blache's immediate notification of the license revocation to North Atlantic's clients. Thus, Blache is not entitled to immunity under La. R.S. 9:2798.1(B) at this time.[170]

## IV. Conclusion

For the reasons set forth herein, **IT IS ORDERED** that Defendant Fabian Blache's Motion to Dismiss the Revised Complaint [171] is **DENIED.**

Signed in Baton Rouge, Louisiana on November 10, 2020.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[168] *Fetty,* 2020 WL 520026 at *13, *citing Lambert v. Riverboat Gaming Enf't Div.*, 96-1856 (La. App. 1 Cir. 12/29/97), 706 So.2d 172, 177–78, *and citing Bouchereau v. Gautreaux*, No. 14-805, 2015 WL 5321285, at *15 (M.D. La. Sept. 11, 2015) (denying motion to dismiss and reaching same result on same ground).

[169] *See* 2020 WL 520026 at *13.

[170] North Atlantic requests leave to amend the complaint with additional facts "if the Court finds that the plaintiff needs more facts in its complaint." R. Doc. 32, p. 10. In light of the denial of the Motion, North Atlantic's informal request to amend need not be addressed.

[171] R. Doc. 27.