# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

NORTH ATLANTIC SECURITY COMPANY         CIVIL CASE NO.

VERSUS         19-379-EWD

FABIAN BLACHE, ET AL.         CONSENT

## RULING AND ORDER[1]

Before the Court is the Defendant's Motion in Limine ("Motion"), filed by Defendant Fabian Blache ("Blache"), which seeks to exclude testimony and exhibits listed on the Pretrial Order by Plaintiff North Atlantic Security Company ("North Atlantic) relating to investigations into Blache and Blache's termination from employment, as well as North Atlantic's lost profits.[2] North Atlantic opposes the Motion.[3] The matter is fully briefed and oral argument is not necessary. As explained further, below, the Motion will be granted in part.

## I. BACKGROUND

North Atlantic formerly held a license to operate a private security business in Louisiana. The license was granted by the Louisiana State Board of Private Security Examiners ("the Board"). Pursuant to a successful contract bid with the Louisiana State Office of Procurement ("OSP"), North Atlantic was awarded a contract in October 2017 to provide security services to several Louisiana state agencies. In August 2018, Blache, the former Executive Secretary of the Board, accused North Atlantic of committing regulatory violations which resulted in the revocation of

---

[1] Based on the parties' consent, this case was referred to the undersigned for all further proceedings and entry of final judgment on September 16, 2019. R. Doc. 23.

[2] R. Doc. 84; R. Doc. 78, pp. 6-9 (Pre-Trial Order). The Motion is technically deficient because it does not contain the certificate of conference required by Local Civil Rule 5.2(h). However, as North Atlantic timely opposed the Motion, it is ripe for resolution. R. Doc. 89. Blache has also filed a reply memorandum. R. Doc. 93.

[3] R. Doc. 89.

North Atlantic's license.[4]  North Atlantic sued Blache for damages under 42 U.S.C. § 1983 and Louisiana state law arising out of Blache's issuance of a cease and desist order to North Atlantic, imposition of a $9,500 fine on North Atlantic, immediate revocation of North Atlantic's private security license without a vote by the Board or a hearing, and Blache's notification of the revocation to OSP, also before a Board hearing.  North Atlantic alleged that the foregoing acts violated its constitutional right to due process under the Fourteenth Amendment to the United States Constitution, right to be free of excessive fines under the Eighth Amendment to the United States Constitution, and similar provisions of the Louisiana Constitution.[5]

Following rulings on Blache's dispositive motions and the Mandate of the United States Court of Appeals for the Fifth Circuit,[6] the only claim ripe for trial is North Atlantic's claim for monetary relief against Blache in his individual capacity for violation of North Atlantic's due process rights under Art. I, Sec. 2 of the Louisiana Constitution when Blache contacted OSP to advise it that North Atlantic's license had been revoked before a hearing by the Board on the final revocation of the license.[7]  A four-day jury trial is set to begin on April 7, 2025.[8]

---

[4] The history of this case has been recounted in other rulings. *See e.g.,* R. Docs. 42, 63.

[5] R. Doc. 25.

[6] R. Docs. 42, 63, 68.

[7] While the Court may (and, generally, should) decline to exercise supplemental jurisdiction when all federal claims have been dismissed, given the length of time this case has been pending, the Court will exercise supplemental jurisdiction over the remaining state law claim in its discretion under 28 U.S.C. § 1367(c). *Hicks v. Austin Indep. Sch. Dist.,* 564 Fed.Appx. 747, 748 (5th Cir. 2014).

[8] The pretrial conference is set for February 18, 2025 and jury filings are due on March 24, 2025.  R. Doc. 90.

## II.   LAW AND ANALYSIS

### A.  Legal Standards on Motions In Limine

"It is well settled that motions in limine are disfavored."[9]  "Motions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial."[10] "An order in limine excludes only clearly inadmissible evidence; therefore, evidence should not be excluded before trial unless it is clearly inadmissible on *all* potential grounds."[11] "Instead, courts should reserve evidentiary rulings until trial so that questions as to the evidence "'may be resolved in the proper context.'"[12]  "When ruling on motions in limine, the Court 'maintains great discretion [as to] evidentiary determinations.'"[13] If the evidence is not clearly inadmissible on all grounds, the better course is for the court to decline to rule in advance of trial so that it will have the opportunity to resolve issues in context."[14]

Blache seeks to exclude: (1) Any and all testimony regarding any investigation that Blache is or may be subject to, including but not limited to investigations by the Office of State Inspector General ("OIG");[15] (2) North Atlantic's Exhibit 11 – "Both Louisiana Office of Inspector General Report[s] on Blache and the agency's conduct" and North Atlantic's Exhibit 12 – "Letter responding to OIG report" from the Board; (3) the testimony of Stephen B. Street Jr., Inspector

---

[9] *Lewis v. Bd. of Supervisors of Louisiana State Univ.,* No. 21-198, 2023 WL 8430364, at *2 (M.D. La. Dec. 4, 2023), citing *Auenson v. Lewis*, No. 94-2734, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996) (citing *Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993))).

[10] *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir. 1980) (superseded on other grounds).

[11] *Lewis*, 2023 WL 8430364, at *2, citing *Rivera v. Robinson*, 464 F. Supp. 3d 847, 853 (E.D. La. 2020) (quoting *Auenson*, 1996 WL 457258, at *1 (emphasis added).

[12] *Lewis*, 2023 WL 8430364, at *2, citing *Washington v. E. Baton Rouge Par. Sch. Bd.*, No. 21-192, 2023 WL 2072083 at *1 (M.D. La. Feb. 17, 2023) (quoting *Auenson*, 1996 WL 457258, at *1).

[13] *Lewis*, 2023 WL 8430364, at *2 (citations omitted).

[14] *Lewis,* 2023 WL 8430364, at *2.

[15] In Blache's Memorandum, he expands this request to additionally seek to exclude evidence of investigations and complaints. R. Doc. 84-1, p. 3.

General of the OIG; (4) the testimony of Major Carl F. Saizan, Jr., current Executive Director of the Board; (5) North Atlantic's Exhibit 7 – "Itemization of losses by NASC contracts"; (6) and the testimony of Jabari Edwards or Antwann Richardson as to North Atlantic's lost profits.[16] As the party objecting to the evidence, Blache bears the burden of showing that the evidence is inadmissible.[17]

### 1. Relevance and Prejudice

Evidence must be relevant to be admissible.[18] Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[19] Relevant evidence is admissible unless the United States Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise.[20] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[21]

Evidence of a person's character or trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. Evidence of "other" crimes, wrongs, or acts is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character; however, it may be admissible for another

---

[16] R. Doc. 84, pp. 1-3.

[17] *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 295 (5th Cir. 2010).

[18] *Acadian Diagnostic Laboratories, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 412 (5th Cir. 2020), quoting Fed. R. Evid. 402.

[19] Fed. R. Evid. 401.

[20] Fed. R. Evid. 402.

[21] Fed. R. Evid. 403.

purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.[22]

        2.  <u>Hearsay</u>

Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[23] Hearsay is not admissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise.[24] After a party properly objects to the admission of evidence as hearsay, the proponent of the evidence bears the burden to show that the statement is not offered as hearsay or falls within an exception to the hearsay rule.[25]

**B.  Exhibits and Testimony Regarding Investigations Into Blache**

        1.  <u>The OIG Reports and the Board's Response</u>

North Atlantic's Exhibit 11 is comprised of a May 8, 2023 OIG Report ("May 2023 Report") that summarizes an OIG "investigation into certain actions of the [Board] and certain employees of the board after the board's chief administrative officer, Fabian Blache III, was placed on Administrative Leave in July of 2021";[26] and a December 18, 2023 OIG Supplemental Report ("December 2023 Report") that summarizes the OIG investigation into matters that were still under

---

[22] Fed. R. Evid. 404.

[23] Fed. R. Evid. 801(c)(1)-(2).

[24] Fed. R. Evid. 802.

[25] *Dempster v. Lamorak Ins. Co.*, 487 F.Supp.3d 548, 552-53 (E.D. La. 2020) (citations omitted).

[26] R. Doc. 78, p. 7 (PTO); R. Doc. 84-2 (May 2023 Report). Per the May 2023 Report, Blache was terminated as Executive Secretary of the Board on September 21, 2021. R. Doc. 84-2, p. 6.

investigation at the time of the May 2023 Report.[27]  North Atlantic's Exhibit 12 is the Board's

December 13, 2023 email response to a draft of the December 2023 Report.[28]

### a. Applicability of Fed. R. Evid. 803(8)(A)(iii) as to the Two Reports in General

Blache acknowledges that the two Reports appear to be an exception to the hearsay rule

because they were prepared by OIG, a state agency; however, he contends that all of OIG's legal

conclusions should be excluded because Fed. R. Evid. 803(8)(A)(iii) only excludes from hearsay

"factual findings" in legally authorized investigations set forth in state agency records.[29]  Blache

also argues that the two Reports should be excluded under Fed. R. Evid. 403 because they are

highly prejudicial to him.[30]  North Atlantic contends that the Reports are not subject to exclusion

on the grounds of hearsay because they are reports from OIG, a state agency authorized to conduct

investigations, and the investigations involved civil matters. As such, they are admissible pursuant

to Fed. R. Evid. 803(8)(A)(iii) unless Blache shows that "the source of information or other

circumstances indicate lack of untrustworthiness" under Fed. R. Evid. 803(8)(B), which Blache

has not shown in this case.[31]  North Atlantic argues that Blache's only potential challenge to the

Reports is on the grounds of undue prejudice.[32]  Blache replies that, while the Fifth Circuit has not

---

[27] R. Doc. 78, p. 7 (PTO); R. Doc. 84-3 (December 2023 Report).

[28] R. Doc. 84-3, p. 23 (Appendix A to December 2023 Report).

[29] Fed. R. Evid. 803 provides, in pertinent part: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:…8) Public Records. A record or statement of a public office if: (A) it sets out: … (iii) in a civil case,…factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."

[30] R. Doc. 84-1, p. 5.

[31] R. Doc. 89, pp. 6-8, citing La. R.S. 49:220.24 (authority of the Inspector General) and *Menard v. Targa Resources LLC*, 523 F.Supp. 3d 882 (M.D. La. 2021); and p. 14, citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). North Atlantic contends that the OIG investigation of Blache involves a civil matter because criminal charges are no longer possible for Blache's potentially applicable crimes in light of the fact that he revoked North Atlantic's license in 2018, citing La. R.S. 14:134 (malfeasance in office is punishable with or without hard labor) and Code of Crim. Proc. art. 572 (providing that felonies not necessarily punishable by imprisonment at hard labor must be brought within four years of the commission of the offense).  Blache does not contest this issue.

[32] R. Doc. 89, p. 9.

ruled on this issue, other courts in this Circuit have held that legal conclusions are not admissible as factual findings under Fed. R. Evid. 803(8), and thus legal conclusions in the Reports are subject to exclusion.[33]  These general objections are addressed below in the context of the specific exhibits.

### b. *North Atlantic's Exhibit 11-The May 2023 Report*

The May 2023 Report summarizes the OIG's investigation into overtime, bonus, and annual leave payments to Blache and his replacement, Bridgette Hull ("Hull"); payments to Blache for a conference in South Africa; Blache's purported employment contract considered by the Board; and the Board's appointment of Hull to replace Blache as Executive Secretary. In addition to his Fed. R. Evid. 803(8)(A)(iii) objections, noted above, Blache argues that all of these events are unrelated to the due process client contact claim remaining in this case and are, therefore, irrelevant.[34] Blache also argues that North Atlantic should not be permitted to introduce the May 2023 Report because it is an attack on Blache's credibility and character, it has no probative value, and is prejudicial to Blache.

North Atlantic argues that pursuant to Fed. R. Evid. 404(b)(2), evidence of other crimes, wrongs, and acts can be offered for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.[35]  North Atlantic argues that the May 2023 Report should come in to demonstrate Blache's motive, as the May 2023

---

[33] R. Doc. 93, p. 5, citing *Warner v. Talos ERT LLC*, No. 18-1435, 2022 WL 534311, at *3 (W.D. La. Feb. 22, 2022), modified on reconsideration on other grounds, No. 18-1435, 2022 WL 19002352 (W.D. La. Dec. 15, 2022); and *Olivier v. Exxon Mobil Corp.*, No. 18-568, 2022 WL 3544300, at *2 (M.D. La. Aug. 18, 2022) (excluding legal conclusions from reports about regulatory violations because "they do not fall within the Public Records exception to the hearsay rule, FRE 803(8)") (block quoted string cite omitted).  Blache argues that *Beech Aircraft Corp.* does not support North Atlantic's position that legal conclusions in agency reports are admissible because the Supreme Court left open the question of whether legal conclusions are admissible under Fed. R. Evid. 803(8).  R. Doc. 93, p. 5.

[34] R. Doc. 84-1; R. Doc. 84-2 (May 2023 Report).  Blache hired Hull as an administrative coordinator receptionist, and then as his administrative assistant. Upon Blache's termination, the Board hired Hull to replace Blache as Executive Secretary.  R. Doc. 84-2, p. 6.

[35] R. Doc. 89, pp. 11-12.

Report states that Blache improperly received overtime payments from the Board's account, the Board is self-funded by fees, and Blache's termination for receiving the overtime payments "ties directly with his systemic abuse of due process and unilateral acts."[36] Further, according to North Atlantic, "Blache was motivated to commit unilateral systematic violations of due process and illegally fine companies [despite a fine schedule] so he could illegally pay himself illegal overtime and bonuses…" as evidenced by the Report, which the jury should see in order to determine Blache's liability. North Atlantic argues that the May 2023 Report should also come in to show absence of mistake because Blache has asserted that his revocation of North Atlantic's license was an "honest mistake" due to an ambiguity in the law on unauthorized weapons.[37]

Blache replies that the May 2023 Report does not indicate the source of the funds used to pay Blache's overtime, and Blache did not assert "mistake" in connection with the temporary revocation of North Atlantic's license, or in connection with the client contact claim (or otherwise in the Motion).[38] Furthermore, Blache contends that North Atlantic's arguments demonstrate that it wants to use the Reports to unfairly prejudice Blache and attack his character, and North Atlantic has not shown how the Reports will help prove Blache's liability for contacting OSP.[39]

Blache repeatedly points out that the remaining claim in this case is for state law denial of due process when Blache temporarily revoked North Atlantic's license and contacted OSP. It must be noted, however, that Blache's notification of the "temporary revocation" to OSP could have effectively operated as a *de facto* final revocation of North Atlantic's license without the required due process because the notification prompted the termination of North Atlantic's contract without

---

[36] R. Doc. 89, p. 12.

[37] R. Doc. 89, p. 13.

[38] R. Doc. 93, pp. 3-4.

[39] R. Doc. 93, p. 3.

a Board hearing.      These circumstances potentially open the door to some of the evidence and testimony Blache currently challenges.  However, that is not the case with respect to the May 2023 Report, which concerns an investigation into internal personnel issues regarding Blache and his replacement that have no bearing on the remaining denial of due process claim.  Any motive by Blache to be paid overtime is not sufficiently related to his actions in contacting OSP to report the temporary revocation of North Atlantic's license.[40]  Additionally, because the May 2023 Report is of limited, if any, probative value as to the only remaining claim in this case, introduction of the Report would only serve to unfairly prejudice Blache and to confuse the jury.[41]  As such, the May 2023 Report will be excluded from trial.[42]

> c.  *North Atlantic's Exhibit 11-The December 2023 Report*

The December 2023 Report summarizes the OIG's investigation into Blache's revocation of North Atlantic's license ("Subpart I"), and investigation into Blache's unilateral revocation of the license of a firearm instructor; imposition of a six-figure fine on each of two licensed security companies; attempted fine on a supermarket; contract with a California company to operate as the

---

[40] North Atlantic's argument that Blache's motive in levying fines against North Atlantic was driven by Blache's desire for overtime payments is too speculative to show motive.

[41] Because the May 2023 Report is excluded on these grounds, Blache's hearsay objection is not reached.

[42] Attached as Appendix A to the May 2023 Report, is the Board's April 11, 2023 letter and Attachment "A" to the letter. It does not appear that North Atlantic seeks to introduce at trial either the Board's April 11, 2023 letter and/or its Attachment "A."  The parties' briefing refers to North Atlantic's Exhibit 12 as being comprised of the Board's December 13, 2023 response to the December 2023 Report (addressed below), and the PTO also only vaguely refers to Exhibit 12 as "Letter responding to OIG report." R. Doc. 78, p. 7. However, to the extent that North Atlantic may attempt to introduce the Board's April 11, 2023 letter and/or Attachment "A," only the portion of Attachment "A," relating to the Board's implementation of "processes" undertaken regarding license revocation, cease and desist orders, *etc.*, is even, arguably, relevant to the only remaining claim in the case (*see,* R. Doc. 84-2, pp. 21-22), and that portion is likely subject to exclusion under Fed. R. Evid. 407 as subsequent remedial measures.  North Atlantic has not addressed use of this information at all, much less argued that it can come in for any of the permitted purposes specified in Fed. R. Evid. 407.  For clarity, the entirety of the May 2023 Report, including Appendix A, is excluded from evidence at trial.

Board's certified online training facility; and contract with an unqualified individual to perform investigative work on behalf of the Board that was not performed ("Subpart II").[43]

Addressing them in reverse order, Blache argues Subpart II should be excluded *in toto* because it concerns matters that are irrelevant to this case and prejudicial to Blache. Blache then argues that Subpart I's findings relating to North Atlantic's license "deals with license revocation and subsequent Board actions, which are irrelevant here," because the only remaining claim is for denial of due process when Blache contacted OSP about the license revocation. Blache further argues that the fact of OIG's investigation into Blache is more prejudicial than probative, and the December 2023 Report is subject to exclusion under Fed. R. Evid. 404 as impermissible character evidence.[44]  However, and notwithstanding the foregoing as to Subpart I, Blache also notes that "only a small portion of the OIG Report directly deals with the alleged client-contact and/or OSP's decision to terminate [North Atlantic's] contract," and concedes that if any part of the December 2023 Report is admitted, only that portion, consisting of 3 paragraphs, is relevant.[45]

North Atlantic responds that since Blache's defense is that he mistakenly revoked North Atlantic's license, the December 2023 Report should come in as "a direct refutation of Defendant Blache's defense, as it details systematic due process violations, and should be admitted as lack of mistake or absence of mistake evidence under FRE 404(b)(2) to assist the jury in its role as a fact finder."[46]  Blache replies that North Atlantic has not explained how the Reports are relevant to the remaining claim in this case, and they unfairly prejudice Blache.[47]

---

[43] R. Doc. 84-1, pp. 5-6; R. Doc. 84-3 (December 2023 Report).

[44] R. Doc. 84-1, p. 5.

[45] R. Doc. 84-1, pp. 5-6.

[46] R. Doc. 89, pp. 13-14. *See also,* pp. 10-11 ("The jury should hear about how Defendant Blache systemically violated other companies' due process rights he regulated to determine whether this was intentional pattern of malicious conduct or a simple confusion or mistake.").

[47] R. Doc. 93, p. 3.

Blache concedes that three paragraphs in Subpart I regarding Blache contacting OSP are relevant to the remaining claim.[48] The Motion will be denied as to those paragraphs of Subpart 1. Additionally, while information of other wrong acts is inadmissible character evidence, it may be admitted for other purposes.  The Motion is also denied at this time as to remaining portion of Subpart I regarding the OIG investigation into North Atlantic's license, and all of Subpart II, which could be relevant to show intent and/or a pattern of denial of due process to other similar licensees and could also be relevant to Blache's state law discretionary immunity defense. That defense does not apply to governmental acts not reasonably related to legitimate governmental objectives or to acts or omissions that constitute intentional or reckless conduct.[49]  These portions of the Reports will be evaluated in the context of their presentation, and objections are reserved to trial.  The parties are advised that this Court has also held that while factual conclusions in agency reports are excluded from hearsay, legal conclusions in agency reports are not subject to Fed. R. Evid. 803(8)'s exclusion from hearsay and will not be permitted at trial because they risk confusing the jury.[50]

---

[48] R. Doc. 84-3, p. 10 as to the 2nd, 5th and 6th paragraphs on the page.

[49] *See,* R. Doc. 78, pp. 4-5 (PTO), citing La. R.S. § 9:2798.1, which provides, in pertinent part, "B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties. C. The provisions of Subsection B of this Section are not applicable: (1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct."

[50] *See, e.g., Olivier,* 2022 WL 3544300, at *2, decided 34 years after *Beech Aircraft Corp.* As noted in *Warner*, analysis of Rule 803(8) has evolved since *Beech Aircraft Corp.* was decided.  2022 WL 534311, at *3. Furthermore, *Beech Aircraft Corp.* left open the issue of whether legal conclusions are admissible under Fed. R. Evid. 803(8) ("We emphasize that the issue in this litigation is whether Rule 803(8)(C) recognizes any difference between statements of 'fact' and 'opinion.'  There is no question here of any distinction between 'fact' and 'law.'  We thus express no opinion on whether legal conclusions contained in an official report are admissible as 'findings of fact' under Rule 803(8)(C)." *Beech Aircraft Corp.,* 488 U.S. at 170, n. 13.

   d. *North Atlantic's Exhibit 12 –The Board's Response to a Draft of the December 2023 Report*

Exhibit 12 is a December 13, 2023 email ("Board's Response") from the current Executive Secretary of the Board, Major Carl F. Saizan, Jr. ("Saizan"), in response to a draft of the December 2023 Report. In the Board's Response, Saizan writes on his own behalf, and that of the Board, to "express our acknowledgement and concurrence with the OIG **draft** report related…to Blache." Saizan notes that he and the Board "find no basis to dispute the facts presented" considering their "limited personal knowledge regarding the investigation." Saizan also states that "[w]e rely on the accuracy of the information in the investigative draft report…."[51]

   Blache argues the Board's Response is subject to exclusion as irrelevant to the only remaining claim because there is no indication that Saizan has knowledge of Blache contacting OSP to advise it of the revocation of North Atlantic's license. The Board Response is also hearsay because it is merely an "acknowledgment and concurrence" with a draft of the December 2023 Report, and Saizan admits having only limited personal knowledge of the investigation. Further, the Board's "concurrence" with the report's findings could lead the jury to presume Blache engaged in wrongdoing and is unfairly prejudicial to Blache.[52] North Atlantic contends that the Board's Response bolsters the trustworthiness of the December 2023 Report and should come in to assist the jury in determining whether Blache mistakenly revoked North Atlantic's license.[53]

   The Board's Response explicitly states that Saizan and the Board reviewed only a "draft report," and had only "limited knowledge regarding the investigation," so they "rel[ied] on the accuracy of the information" in the December 2023 Report. The Board Response's

---

[51] R. Doc. 84-3, p. 23 (emphasis added).

[52] R. Doc. 84-1, pp. 6-7.

[53] R. Doc. 89, pp. 14-15.

"acknowledgment" and "concurrence" with the December 2023 Report's findings is based on hearsay, and it is also unfairly prejudicial to Blache and could confuse the jury. As such, the Motion will be granted, and the Board Response, North Atlantic's Exhibit 12, will be excluded.

2. <u>Witness Testimony Regarding the OIG Reports and the Board's Response</u>

a. *Testimony of Stephen B. Street, Jr., Inspector General ("Street") and/or Nicole Compton*

Blache seeks to exclude the testimony of Street, the nature of which is not defined in the PTO, because Street has no personal involvement in any of the events at issue. Blache argues that, to the extent North Atlantic intends to call Street to testify regarding the OIG investigations, the testimony is irrelevant for the same reasons as the Reports; the testimony should be excluded as hearsay due to Street's lack of personal knowledge of the events, particularly the client contact claim; and Street's testimony would be unfairly prejudicial to Blache.[54]

In its Opposition, North Atlantic argues that testimony regarding the investigations should come in under Fed. R. Evid. 404(b)(2) to prove Blache's motive, intent, absence of mistake, *etc*. because Blache contends that his revocation of North Atlantic's license was a mistake.[55] North Atlantic clarifies that, following the release of the Reports (which was after the discovery deadline), it learned the name of the investigator who actually conducted the investigations, Nicole Compton ("Compton"), and she is available to testify regarding the Reports.[56] Blache replies that Compton is not listed as a witness on the PTO and should not be permitted to testify.[57]

Just as the May 2023 Report has been excluded from trial due to the risk of prejudice to Blache and jury confusion since it is of limited probative value as to the only remaining claim in

---

[54] R. Doc. 84-1, p. 7.

[55] R. Doc. 89, pp. 10, 12-14.

[56] R. Doc. 89, pp. 12-14.

[57] R. Doc. 93, p. 2.

this case, the same is true of any testimony from Street or Compton about information contained in that Report. Additionally, as to Compton, she was not listed by North Atlantic as a potential witness on the proposed PTO that was submitted by the parties on July 15, 2024.[58] It is not clear from the briefing when North Atlantic learned of Compton's involvement in the OIG investigations, but the latest of the Reports is dated December 18, 2023. Fact discovery in this matter has been closed for years and it would be unfairly prejudicial to Blache to allow Compton to testify as to the Reports at this late date.

While Blache claims that Street has no relevant personal knowledge, Street's name is on the Reports, and it is not clear if North Atlantic agrees as to Street's lack of knowledge because it has not suggested that it will amend the PTO to remove Street as a witness. If Street has personal knowledge of the OIG investigations and/or any portion of the December 2023 Report that may be admitted at trial, Street may have relevant testimony. Therefore, Street will be permitted to testify as to his personal knowledge of the information in the December 2023 Report (if any), and objections to his testimony will be addressed at trial.

> b. *Testimony of Major Carl F. Saizan, Jr.*

Blache argues that Saizan should be excluded as a witness because he was not employed by the Board during the events at issue and was not privy to any relevant communications; he has only limited personal knowledge of the OIG investigation; and Saizan's purported concurrence with the December 2023 Report would be unfairly prejudicial to Blache.[59]

In its Opposition, North Atlantic indicates that Saizan might be called to testify regarding the Board's Response, which should come in under Fed. R. Evid. 404(b)(2) to demonstrate

---

[58] R. Doc. 78.

[59] R. Doc. 84-1, p. 8.

Blache's motive, opportunity, intent, preparation, plan, knowledge, *etc*.[60]  Saizan will not be permitted to testify because the only topic North Atlantic indicated (in its Opposition memorandum) that Saizan has personal knowledge to testify about is the Board's Response, which is excluded.

    3.   <u>General Testimony and Evidence Regarding Investigations into Blache and His Termination</u>

Blache also generally seeks to exclude any testimony or documents, such as complaints or lawsuits, relating to investigations of Blache or his termination by the Board pursuant to Fed. R. Evid. 404(b), which precludes the introduction of character evidence to prove that on a particular occasion the person acted in accordance with their character. Blache contends that testimony about his termination would invite the jury to speculate that Blache engaged in wrongdoing, despite that his termination is unrelated to this case, and testimony about investigations into his conduct would be highly prejudicial to him.[61]

North Atlantic contends that this evidence is admissible pursuant to Fed. R. Evid. 404(b)(2) to prove motive, intent, lack of accident, or mistake, and should be permitted because Blache has defended his actions in revoking North Atlantic's license by arguing that it was an honest mistake. North Atlantic argues that the jury should review evidence and testimony regarding Blache's termination and investigations into Blache's conduct to show that Blache intentionally denied North Atlantic's due process rights, as well as the rights of other companies.[62]  Blache responds that he argued the defense of "mistake" in connection with the meaning of "unauthorized weapon," but did not assert that defense as to the license revocation, which claim is no longer at issue, nor

---

[60] R. Doc. 89, pp. 10-11, 14.

[61] R. Doc. 84-1, pp. 3-4, citing four non-controlling Ninth Circuit cases.

[62] R. Doc. 89, pp. 10-12.

in defense of the operative client contact claim. Blache further responds that North Atlantic's statement that the jury "will not give [Blache] the benefit of the doubt" demonstrates that North Atlantic is attempting to use evidence of investigations and his termination to improperly attack his character.[63]

This request overlaps somewhat with the requests to exclude the Reports and the testimony of Street and Saizan, addressed above. The Motion is otherwise denied as to this *in globo* request because it lacks specificity as to the substance of the potential testimony and exhibits to be offered regarding the investigations into, and termination of, Blache, some of which could be relevant for the reasons explained. Objections to specific testimony and evidence offered as to investigations into Blache and his termination not otherwise addressed in this Ruling and Order will be addressed in the context of its presentation at trial.

### C. Exhibits and Testimony Regarding North Atlantic's Itemization of Losses

North Atlantic's Exhibit 7, referred to in the PTO as "Itemization of losses by NASC contracts," ("Itemization") appears to be a spreadsheet containing alleged figures for the purchase price of North Atlantic, and the company's monthly and annual revenues, annual expenses, annual "growth multiplier[s]" (ranging from 6% to 30%), annual net income, and projected total revenue from 2018 to 2024, as well as profitability (*i.e.*, $9,184,000, approximated as 3.5 times projected 2024 revenue (EBITDA) of $2,624,000).[64] North Atlantic intends to call current North Atlantic President Jabari Edwards and former North Atlantic President Antwann Richardson to testify at trial about, *inter alia*, "contract losses."[65]

---

[63] R. Doc. 93, pp. 3-4.

[64] R. Doc. 84-4.

[65] R. Doc. 78, pp. 8-9.

Blache alleges that, while there are no cases addressing lost profits in a due process client contact claim under state law, cases seeking lost profits generally are instructive. Under Louisiana law, claims for lost profits must be proven with reasonable certainty and cannot be based on conjecture and speculation, and "[a] claim for lost profits based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute reasonable certainty.'"[66] Blache argues that the Itemization is North Atlantic's only document supporting damages, but it is "not an itemization of losses or a summary, but rather numbers that have no basis in fact and are nothing more than exaggerated speculation," and contends that the numbers "do not add up." In particular, Blache alleges that the annual income and annual revenues figures are too close (*e.g.*, 2018 annual revenue of $960,000 and annual income of $936,960, despite annual expenses of $384,000) with no explanation for the calculations; there is no evidence of how North Atlantic would grow from 6% to 30% a year in a competitive market, where the contracts at issue are subject to public bid laws and the lowest bidder is awarded the contract; and there is no explanation or supporting evidence for how North Atlantic could be valued at $9,184,000. Blache contends that North Atlantic failed to provide any supporting documentation for its figures, failed to offer relevant evidence of past revenues and profits to compare to its alleged future damages, and failed to show how the purchase price of North Atlantic is relevant. Blache contends that the Itemization is also not a summary exhibit (presumably, pursuant to Fed. R. Evid. 1006)[67] because it is not

---

[66] R. Doc. 84-1, pp. 8-9, citing *Team Contractors, LLC v. Waypoint NOLA, LLC*, No. 16-1131, 2017 WL 4314599, at *3 (E.D. La. Sept. 28, 2017) (citing *Mac Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 753 (5th Cir. 1994) (other citations omitted).

[67] Fed. R. Evid. 1006, as currently in effect, provides: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."

supported by any evidence. For all these reasons, Blache seeks to exclude the Itemization as unreliable, confusing, and speculative, or alternatively, as an improper summary exhibit.[68]

Blache also seeks to exclude the testimony of Edwards and Richardson as to lost profits, arguing that they do not have sufficient knowledge to testify regarding lost profits and any such testimony would be "pure speculation, and, to the extent their testimony would rely on Exhibit 7, entirely unreliable. Louisiana law does not permit a claim for lost profits based on conjecture and/or speculation."[69]    However, Blache alternatively argues that they should be limited to testifying as to lost profits that are based on evidence that shows lost profits with "reasonable certainty."[70]

North Atlantic maintains that to recover lost profits for a breach of contract, it must show "(1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty."[71] According to North Atlantic, recovery of lost profits is not limited to lost profits stemming from the underlying contract but could also include lost profits derived from "collateral undertakings," such as those that could have been realized from other profit making endeavors.[72] Somewhat disjointedly, North Atlantic similarly argues that it should be able to recover damages for loss of earning capacity from "employment they hoped to obtain in the future" because the right to

---

[68] R. Doc. 84-1, pp. 2-3, 8-10.

[69] R. Doc. 84-1, p. 11, citing *Team Contractors LLC,* 2017 WL 4314599 at *3.

[70] *Id.*

[71] R. Doc. 89, p. 15, citing *Standard Fed. Bank v. United States,* 62 Fed. Cl. 265, 273 (Fed. Cl. 2004).

[72] R. Doc. 89, p. 15, citing *id.*

conduct future business is a property right that North Atlantic was denied when its due process rights were violated.[73] North Atlantic maintains that loss of earning capacity refers to "…a persons' potential," "is available to all industries," and "[d]amages for loss of earning capacity should be estimated on [an] injured person's ability to earn money, rather than what he actually earned before the injury…."[74] In support of this argument, North Atlantic specifically alleges that it aggressively pursued the state security contracts it was awarded, and was going to use that award, as well as North Atlantic's reputation, "as a springboard to aggressively pursue and expand" its business into other states and the private sector, but was foreclosed from doing so when Blache revoked its license without due process because North Atlantic could no longer attract any business in any state.[75] Thus, North Atlantic is seeking to use the Itemization as evidence of loss of earning capacity in addition to lost profits. North Atlantic contends that the Itemization demonstrates a "clear profit loss, easily shown by the contract value analysis breakdown…."[76] Furthermore, North Atlantic argues that Edwards and Richardson should be permitted to testify regarding their personal knowledge of the underlying contracts, their value and how they were acquired; future potential contracts; and North Atlantic's plans for growth, pursuant to Fed. R. Evid. 701 as lay witnesses giving opinion testimony.[77]

---

[73] R. Doc. 89, pp. 3-4, citing *Banjavich v. Louisiana Licensing Bd. for Marine Divers,* 111 So.2d 505 (La. 1959).

[74] R. Doc. 89, pp. 5-6, citing *Bland v. Green,* 2019-0550 (La.App. 4 Cir. 6/27/19), 363 So.3d 376 and *Folse v. Fakouri,* 371 So.2d 1120, 1124 (La. 1979).

[75] R. Doc. 89, pp. 6, 16-17.

[76] R. Doc. 89, pp. 15-16.

[77] R. Doc. 89, pp. 16-17, citing Fed. R. Evid. 701, which provides, in pertinent part: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue…" and citing *Louisiana Land and Exploration Co. v. Verdin,* 95-2579 (La. App. 1 Cir. 9/27/96), 681 So.2d 63, *writ denied,* 96-2629 (La. 12/13/96), 692 So.2d 1067 (in a possessory action, permitting lay testimony of the plaintiff property owner's employee under Fed. R. Evid. 701 about expected repair costs to property damaged by defendant because the employee had fourteen years of experience with the same repairs and repair costs at other locations).

Blache replies that the Itemization is not clear and does not show a valuation of North Atlantic's contracts, nor does it make clear if it refers to North Atlantic's contracts in states other than Louisiana.[78]  Blache contends that North Atlantic did not seek loss of earning capacity damages in its Amended Complaint, and it has not explained how a business can be permitted to recover damages for loss of earning capacity because loss of earning capacity is "an 'injured person's ability to earn money,' not a business's ability to earn money from an alleged due process violation."[79]  Blache argues that North Atlantic's attempt to recover for loss of earning capacity due to the final revocation of its license is an attempt to improperly seek damages on the license revocation claim, which is not the remaining claim in this case.[80]  Regarding the witnesses, Blache argues that Edwards and Richardson should not be permitted to testify regarding "[f]uture *potential* contracts and unprovable 'growth,'" and "speculative 'rapid expansion into different security markets'" because such lay witness testimony is too speculative in the context of lost profits, which is prohibited, and their testimony cannot be the sole basis for such damages.[81]

1. Evidence of North Atlantic's Future Lost Income is Admissible

Blache is correct that North Atlantic did not seek "loss of earning capacity" damages in its Amended Complaint, and North Atlantic's cited authority involves loss of earning capacity awards to individuals, not businesses.[82] North Atlantic does not cite any caselaw where a business was

---

[78] R. Doc. 93, p. 6.

[79] R. Doc. 93, p. 7.

[80] R. Doc. 93, p. 2.

[81] R. Doc. 93, pp. 6-7, citing *Team Contractors*, 2017 WL 4314599 at *3.

[82] *Folse,* 371 So.2d at 1121 (awarded loss of earning capacity damages to a plaintiff bus driver injured in a motor vehicle accident); *Bland,* 363 So.3d at 380-81 (reversing lower court grant of motion in limine excluding testimony and opinion of expert regarding injured carpenter's lost earning capacity); *Banjavich,* 111 So.2d at 515-16 (finding unconstitutional statutes that created a governing board tasked with licensing commercial marine divers because they vested arbitrary powers to the board and violated the constitutional property rights of the plaintiff marine divers to engage in business). North Atlantic's authority, *Standard Fed. Bank,* 62 Fed. Cl. at 273, is a U.S. Court of Federal Claims that heavily relies on authority citing the Restatement (Second) of Contracts. North Atlantic has not shown

awarded "loss of earning capacity" damages, and it does not appear that Louisiana law recognizes "loss of earning capacity" damages for businesses. However, North Atlantic does claim "loss of income, past, present and future," as an item of damages in the Amended Complaint.[83] To the extent North Atlantic can provide competent, non-speculative evidence of loss of future income, such evidence is properly admissible at trial.

### 2.  The Itemization Will Be Excluded

Plaintiff's intended use of the Itemization is not clear.[84] While Fed. R. Evid. 1006 permits voluminous evidence that cannot be conveniently examined in court to be introduced in the form of a chart or summary, "recognizing the possibility for misuse of summary charts, the Fifth Circuit has cautioned that the trial judge must carefully handle their preparation and use."[85] A chart may also be used as a pedagogical aid under Fed. R. Evid. 611(a)[86] (though not admitted into evidence) to summarize evidence presented to the jury if the chart is consistent with the evidence and not misleading.[87]  While a Rule 1006 chart is evidence, a Rule 611(a) chart is not.[88]  Regardless of the

---

how a non-controlling case applying the Restatement Second of Contracts is relevant to the claims in this case arising under Louisiana law.

[83] R. Doc. 25, p. 6.

[84] Plaintiff lists the Itemization as Exhibit 7 on the PTO, suggesting that it intends to use the chart as evidence.  R. Doc. 78, p. 6.

[85] *United States v. Jennings*, 724 F.2d 436, 441 (5th Cir. 1984), citing *Myers v. United States*, 356 F.2d 469, 470 (5th Cir., cert. denied, 384 U.S. 952 (1966).

[86] Fed. R. Evid. 611(a) states: The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."  A district court has discretion to allow summary charts as demonstrative aids or pedagogical devices under this rule.  *See, e.g., United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000).

[87] *United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003), citing *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985).

[88] *See, Pierce*, 753 F.2d at 431.

intended use, appropriate evidence must support either type of chart. When a chart is misleading, it should be excluded because its probative value is outweighed by the risk of undue prejudice.[89]

Regardless of Plaintiff's intended use, Blache is correct that the basis for the information in the Itemization is unclear. North Atlantic has not provided any supporting documentation or explanation for any of the figures provided, including the growth multiplier, alleged profitability of the company, and profit loss. North Atlantic did not substantively address this argument. In the trial court's discretion, summary charts are only admissible under Rule 1006 when the following factors are present: "(1) the charts are based on competent evidence before the jury; (2) the primary evidence used to construct the charts is available to the other side for comparison in order that the correctness of the summary may be tested; (3) the person who prepared the charts is available for cross-examination; and (4) the jury is properly instructed concerning their consideration of the charts."[90] Here, even if the other factors may be met, Blache has argued that the evidence used to construct the charts has not been made available to him for comparison to test the correctness of the chart. This information has also not been provided to the Court.[91] Because the Itemization is unreliable for lack of supporting documentation and/or explanation, which also renders it prejudicial to Blache, it will be excluded from trial.

       3.   <u>Testimony of Jabari Edwards ("Edwards") and Antwaan Richardson ("Richardson")</u>

Blache acknowledges that Edwards and/or Richardson may have personal knowledge of the information referenced on the Itemization, such as North Atlantic's annual income and

---

[89] *See, e.g., United States v. Crinel*, No. 15-61, 2017 WL 490635, at *8 (E.D. La. Feb. 7, 2017) (excluding summary chart with misleading information).

[90] *United States v. Solvay*, No. 06-2662, 2016 WL 1258401, at *12 (S.D. Tex. March 31, 2016), aff'd sub nom., *United States ex rel King v. Solvay Pharms., Inc.*, 871 F.3d 318 (5th Cir. 2017), citing *United States v. Winn*, 948 F.2d 145, 159 (5th Cir. 1991) (other citation omitted).

[91] No exhibits listed in North Atlantic's portion of the PTO would appear to support the information in the Itemization.

expenses. While this testimony is relevant to North Atlantic's claim for lost profits, "[a] claim for lost profits based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute reasonable certainty.'"[92] As with the Itemization, which will be excluded from evidence, it is not clear what information North Atlantic would present to substantiate the testimony of Edwards and/or Richardson on this issue. At most, North Atlantic lists "All Contracts with clients" as an exhibit on the PTO.[93] While this is vague as to what contracts North Atlantic refers, it is possible that this additional information is sufficient to substantiate some of the testimony of Edwards and/or Richardson. To the extent their testimony establishes a purported fact with reasonable certainty,[94] and it is not based on conjecture and speculation,[95] it is admissible. However, it is important to note a couple of potential limitations on this testimony. First, per the OSP August 10, 2017 bid for the work: "Contract will become effective date of award for a period

---

[92] *Team Contractors, LLC*, 2017 WL 4314599, at *3 (citing *Mac Sales, Inc.*, 24 F.3d at 753 (other citations omitted).

[93] R. Doc. 78, p. 6.

[94] *Louisiana Farms v. Louisiana Dep't of Wildlife & Fisheries,* 95-845 (La.App. 3 Cir. 10/9/96), 685 So.2d 1086, 1105–06, *writ denied,* 97-0486 (La. 4/4/97), 692 So.2d 420, and *writ denied,* 97-0507 (La. 4/4/97), 692 So.2d 422 (in a case seeking lost profits due to deprivation of property without due process, holding: "[B]road latitude is given in proving lost profits because this item of damages is often difficult to prove and mathematical certainty or precision is not required. *See Fritscher v. Chateau Golf & Country Club,* 453 So.2d 964 (La.App. 5 Cir.), *writ denied,* 460 So.2d 604 (La. 1984); *Lavigne v. J. Hofert Company,* 431 So.2d 74 (La.App. 1 Cir. 1983). But, damages cannot be awarded where lost future profits are based purely on conjecture and speculation. *Graham [v. Edwards],* 614 So.2d 811 [(La.App. 2 Cir.)]. The allowance of loss of profits as an element of damages is more liberal in tort actions than actions for breach of contract. *Barnett v. Jabusch,* 94–819 (La.App. 3 Cir. 2/1/95); 649 So.2d 1158; *Haggerty v. March,* 480 So.2d 1064 (La.App. 5 Cir. 1985); *Dubois v. State Through Dept. Of Pub. Safety,* 466 So.2d 1381 (La.App. 3 Cir.1985). The judge or jury has much discretion in the assessment of damages in tort cases. La. Civ. Code art. 2324.1.").

[95] 6 Saul Litvinoff & Ronald J. Scalise, Jr.,  Louisiana Civil Law Treatise, The Law Of Obligations § 4.9 (2d ed. 2023) ("Even in actions for quasi-delictual, rather than contractual, damages, in spite of the more liberal approach to the granting of recovery that prevails when profits have been lost because of a tort, Louisiana courts have never accepted a party's own estimation or projections as proof of profits allegedly lost. The self-serving and speculative testimony of a party as to the profit he anticipated cannot sustain an award for the loss of such profit.") (citing *Young v. South Central Bell Telephone Company,* 412 So.2d 147 (La.App. 4 Cir. 1982) and *F & F Transfer, Inc. v. Tardo,* 425 So.2d 874, 876 (La.App. 4 Cir. 1983); *Shreveport Laundries v. Red Iron Drilling Co.,* 192 So. 895 (La.App. 2 Cir. 1939); and *see Louisiana Farms,* 685 So.2d at 1105–06, ("Damages in the nature of lost profits resulting from an offense or quasi-offense must be proved with reasonable certainty, that is, that the loss of future profits is more probable than not. *Borden, Inc. v. Howard Trucking Co., Inc.,* 454 So.2d 1081 (La. 1983); *Graham v. Edwards,* 614 So.2d 811 (La.App. 2 Cir.), *writ denied,* 619 So.2d 547 (La. 1993).").

of twelve (12) months." "Upon agreement of the State of Louisiana Agency and the contractor, a term contract may be extended for 2 additional 12-month periods at the same prices, terms and conditions. In such cases, the total contract term cannot exceed 36 months."[96] Thus, it appears that North Atlantic's contract was for a 12-month initial term, with an option to renew for 2 more terms not to exceed 36 months total. While the specific date that North Atlantic was awarded the contract is unknown, the bid date was August 10, 2017,[97] and North Atlantic's license was revoked on August 14, 2018, with an effective date of August 31, 2018.[98] This suggests that North Atlantic had the contract for the majority of the initial 12-month term, which leaves a maximum of about twenty-four months of revenue left on the contract of which North Atlantic was potentially deprived, assuming North Atlantic can show that renewal of the contract was more than speculative.[99] Additionally, while North Atlantic has argued that its lost profits should not be limited to only those profits stemming from the underlying contract but could also include lost profits derived from "collateral undertakings," such damages would have to be proven to a reasonable certainty, which standard is not met solely through the testimony of Edwards and/or Richardson. Further, North Atlantic's own case law would require a showing that the "(1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for

---

[96] R. Doc. 50-4, p. 1, 4 ("Invitation to Bid"). *See also, id.* at p. 19 (contract awarded for an initial period not to exceed 12 months…at the option of the state and contractor, can be extended for 2 additional 12-month periods…total contract time cannot exceed 36 months). The underlying contract is not in the record but is listed on the PTO by North Atlantic. R. Doc. 78, p. 6.

[97] R. Doc. 50-4, p. 1.

[98] R. Doc. 63, p. 3 and R. Doc. 25, ¶ 15.

[99] The contract was rebid on August 23, 2018. R Doc. 50-6, p. 1.

estimating the amount of lost profits with reasonable certainty."[100]  This means that, under the test North Atlantic asks this Court to adopt, in addition to reasonable certainty, it must also show that Blache's decision to contact OSP more directly caused (rather than was just a but-for cause of)[101] the damages North Atlantic seeks to recover and that the loss(es) were foreseeable to Blache. While this is a high hill and the Court is skeptical of North Atlantic's ability to climb it,[102] it cannot be said at this point that the testimony of Edwards and/or Richardson would be inadmissible for any purpose. Accordingly, the Motion will be denied as to their testimony at this time.  Objections to their testimony are reserved for trial.

## III.  CONCLUSION

Blache's Motion in Limine will be denied as to the portion of North Atlantic's Exhibit 11 that is the December 2023 Report. Some of the December 2023 Report is directly relevant to the remaining claim and other portions may also be relevant to that claim and/or Blache's defenses; however, the portion of Exhibit 11 that is the May 2023 Report will be excluded as any potential relevance is outweighed by the potential prejudice to Blache.  The Motion is denied as to Inspector General Stephen B. Street, Jr. because he may have personal knowledge of the December 2023

---

[100] R. Doc. 89, p. 15, citing *Standard Fed. Bank,* 62 Fed. Cl. at 273.

[101] *See, e.g., In re Complaint of ENSCO Offshore Co.*, 9 F.Supp.3d 713, 721 (S.D. Tex. 2014) ("Proximate cause is more than "but for" causation….").

[102] *See*, 6 Saul Litvinoff & Ronald J. Scalise, Jr., Louisiana Civil Law Treatise, The Law Of Obligations § 4.9 (2d ed. 2023) ("[T]he future profits lost by an established business may be regarded as reasonably certain when proved by a record of past profits." (citing McCormick, Damages 107 (1935) and *White Haute, LLC v. Mayo*, 9-CA-955 (La. App. 5 Cir. 3/23/10), 38 So.3d 944 (where the court held that a plaintiff's claim that her new bar would be successful was not a sufficient basis for awarding her lost future profits when she produced no documentation of the profits she ordinarily earned at her former bar and when her explanation as to the greater profit she expected at her new bar was vague and general."). However, North Atlantic's portion of the PTO does not seem to list any exhibit that appears to contain evidence of past profits and, as noted above, the case law is clear that testimony of an injured party, which is unsubstantiated by other evidence, does not constitute the reasonable certainty required to support a lost profits claim.

Report that is relevant to the remaining claim. OIG Investigator Nicole Compton is not listed as a witness on the PTO and will not be permitted to testify.

The Motion will be granted as to North Atlantic's Exhibit 12, the Board's Response, which is hearsay, and because Exhibit 12 is the only topic specified for Executive Secretary Major Carl J. Saizan, Jr., his testimony will also be excluded. Other testimony and evidence offered regarding investigations of Blache and his termination will be addressed in the context of its presentation at trial.

The Motion will be granted as to North Atlantic's Exhibit 7, "Itemization of losses by NASC contracts," because it contains confusing calculations, lacks explanation and supporting documentation, and is prejudicial to Blache. The Motion will be denied as to the testimony of current North Atlantic President Jabari Edwards and former North Atlantic President Antwann Richardson. Edwards and Richardson will be permitted to testify regarding their personal knowledge of lost profits, provided there is additional evidence introduced sufficient to substantiate their testimony.

Accordingly,

**IT IS ORDERED** that the Motion in Limine, filed by Defendant Fabian Blache is **GRANTED IN PART**. For the reasons set forth, above, the following are excluded from evidence at the trial of this matter:

- The portion of North Atlantic Exhibit 11 comprised of the May 2023 OIG Report;

- North Atlantic Exhibit 12, the Board's Response to the December 2023 OIG Report;

- Major Carl J. Saizan, Jr. as a witness; and

- North Atlantic Exhibit 7, "Itemization of losses by NASC contracts."

The Motion is **DENIED** as to all other exhibits and testimony sought to be excluded.  All other

objections are reserved for trial.

     Signed in Baton Rouge, Louisiana, January 28, 2025.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**